MARTIN PETRUCELLI, APPELLANT, v. BOARD OF TRUSTEES OF THE PUBLIC EMPLOYEES' RETIREMENT SYSTEM, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 13, 1986—Decided June 25, 1986.

Before Judges KING, SIMPSON and SCALERA.

*Joseph V. DeMasi* argued the cause for appellant (*DeMasi & DeMasi*, attorneys).

*Kathleen O. Curley*, Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards*, Attorney General, attorney; *James J. Ciancia*, Assistant Attorney General, of counsel).

The opinion of the court was delivered by

KING, P.J.A.D.

This appeal is taken from the denial of accidental disability retirement benefits under *N.J.S.A.* 43:15A–43.[1] The Board of Trustees of PERS denied the application, finding appellant permanently and totally disabled as a result of "pre-existing long-standing arthritis" and thus confirming the conclusions of the administrative law judge who had recommended denial of benefits. We disagree as a matter of law and reverse.

Martin Petrucelli, age 51, worked for the State's Department of Environmental Protection (DEP) as an Environmental Compliance Investigator I when he was injured in the fall which is the basis of this accidental disability claim. His job was to investigate sewage treatment plants, pumping stations, industrial waste treatment plants and other sanitary facilities being constructed throughout New Jersey. The work was physically very taxing. Petrucelli conducted manhole inspections in which he would walk anywhere from two to three miles, lifting 25 to

---

[1] Ordinary disability benefits are usually the minimum of 40% of final compensation, *N.J.S.A.* 43:15A–45; accidental disability benefits are 2/3 of final compensation. *N.J.S.A.* 43:15A–46.

30 manhole covers each weighing between 100 and 200 pounds, and crawl ten to 35 feet underground, often dragging heavy equipment, in order to conduct various tests on the interceptor lines. His duties also included the testing of potable water which required going into the water treatment plants and descending many series of stairs to reach the source of the water where he took samples and ran field analyses of its quality.

Petrucelli had worked for the State since 1963, first for the Department of Transportation and then, since 1971, for DEP. Prior to working for the State, Petrucelli had owned a tavern for six years, worked as a brick layer and a stone mason, and served in the Army for three years. He had never suffered any injury to or problem with his back nor experienced any type of anxiety or depression prior to his accident. Petrucelli is married with two children, an avid fisherman and hunter before the accident who enjoyed bowling, skiing and snowmobiling with his family. In sum, his work was strenuous and his life was physical.

On October 28, 1981 Petrucelli was instructed to conduct an on-site inspection of a new treatment facility under construction in Berkeley Heights. He arrived at the facility at about 8 a.m. and checked in at the engineer's office. His co-worker did not arrive and Petrucelli conducted the inspection alone. At about 3 p.m. that afternoon, Petrucelli entered the main operations building to inspect recently completed work in that area. He entered a stairwell which descended into the facility's partial flume pit area, an artificial channel used for conducting water. The stairwell had been substantially completed but lacked permanent railings and protective shields as well as non-skid strips on the steps themselves. A temporary railing consisting of a 2 by 4 supported by two 4 by 4 posts was in place on either side of the steps.

As Petrucelli began to descend the nine steps leading to an open landing approximately 20 feet above the partial flume pit,

he slipped on some loose granular material on the second step. Attempting to regain his balance, his foot sought the third step but he landed on a loose 4 by 4 piece of timber laying across the step which resulted in a skate-board like skid of his right foot. Petrucelli fell face-first down the nine-step stairwell in spread-eagle fashion. He said that hitting the landing wall "felt like a cannon had exploded" in his head, rendering him semi-conscious. He was unable to catch his breath and was bleeding from the mouth. Lying on the open landing he began to fear that he would pass out and fall into the water below. His legs were very stiff, but he managed to crawl back up the stairs. Reaching the top, he found his legs completely paralyzed and he simply lay there gasping until he was discovered some 15 minutes later.

Petrucelli was taken by ambulance to the Trauma Center of Overlook Hospital in Union. He received emergency treatment, was x-rayed and released after six hours with instructions to obtain a follow-up exam with his family doctor. The x-ray report issued by Overlook Hospital at the time of Petrucelli's emergency admission revealed narrowing of disc space at C–5/C–6, hypertrophic changes seen anteriorly at C–5/C–6, degenerative changes of the thoracic spine, grade I spondylolisthesis at the L–5/S–1 level, a narrow disc space at that level also and hypertrophic changes anteriorly at L–4/L–5. The report further noted that no fractures were found in Petrucelli's cervical or thoracic spine and that his chest, right hip, left ribs and left clavicle appeared normal.

After conferring with his family doctor the following day, Petrucelli was referred to John Patrick Mullen, M.D., a board certified orthopedic surgeon. Petrucelli was treated by Dr. Mullen and his associate, Dr. John J. Ialeggio for severe spasm on the right side with bilateral sciatic notch on the right with a positive sciatic notch on the right. Petrucelli spent two weeks in traction at Easton Hospital in November and was still under his doctor's care at the time of the trial. He underwent a CAT scan in February 1982. The scan revealed spondylolisthesis at

the L-5/S-1 level, a vacuum disc and bilateral spondylolysis about the pars interarticularis of L-5.

Prior to trial, the State stipulated that Petrucelli was permanently and totally disabled and that his fall constituted a traumatic event. The State continues to agree on appeal that this accident constituted a "traumatic event" within the meaning of *N.J.S.A.* 43:15A-43. *See Kane v. Board of Trustees, Police & Firemen's ret.,* 100 *N.J.* 651, 663 (1985) (*e.g.,* fireman falling off top step of a tall ladder—characterized a traumatic event). The two issues to be resolved at trial were whether Petrucelli's disability was the direct result of the traumatic event and whether his admitted total neuropsychiatric disability was permanent in nature.[2] The latter issue is not raised on this appeal.

Much of the trial consisted of expert testimony on the first issue—whether Petrucelli's admitted total orthopedic disability was the "direct result" of the traumatic event within the meaning of *N.J.S.A.* 43:15A-43. Petrucelli presented his treating physician, Dr. Mullen, and the report of an examining physician, Dr. Charles L. Ludivico. Dr. Harold Bennett appeared on behalf of the Board.

The doctors all agreed that Petrucelli's past medical history was completely negative for any back problems. There is not a shred of a suggestion in the record that he had had back pain or back symptoms of any kind before the accident. This negative history was entirely consistent with his previously vigorous life style. All the doctors agreed that the traumatic event of

---

[2]Some months after the accident when Petrucelli learned that he would be unable to return to work, he became depressed and anxious. Dr. Solomon Bensimhon determined that he was suffering from reactive depression and prescribed anti-depressant drugs in combination with psychotherapy. At trial the Board's expert concurred in this diagnosis but estimated that Petrucelli would probably recover within a year, whereas Dr. Bensimhon thought that it might take closer to two years. The ALJ concluded that Petrucelli's admitted total neuropsychiatric disability was not permanent and denied him accident disability retirement on a neuropsychiatric basis.

October 28, 1981 initiated the pain and symptoms which continue to persist and will be permanent.

There is no doubt that appellant had some quiescent, non-symptomatic arthritic and structural changes demonstrable on x-ray which were activated into painful symptomatology as a result of the severe fall. The principal condition demonstrated on x-rays was known as Class I spondylolisthesis, a structural anomaly involving the anterior slippage of L5 on S1 of less than 25%. "In spondylolisthesis symptoms are often absent, and the defects are then discovered only incidentally on roentgenograms made for other purposes." *Campell's Operative Orthopedics* 2080 (Mosly 1980). A single severe injury can cause the underlying quiescent anomaly to become part of a symptomatic low-back situation. *Ibid.* This is obviously what happened here.

This case did not involve any issue of credibility. All agreed that the past medical history was negative for any back problems. No one questioned Petrucelli's sincerity or his complaints. Petrucelli's treating orthopedic physician said that "people can have [spondylolisthesis x-ray findings] for years and have had them for years and can do what they want to with them." Dr. Bennett, who testified for PERS, thought that Petrucelli's problem resulted from "contusions and sprains" suffered in the fall, superimposed on pre-existing marked structural deficiencies, spondylolisthesis and arthritis. Bennett felt that the chronic subsequent pain which appellant still experiences was related to these pre-existing conditions, rather than to the "contusions and sprains" suffered in the fall. Bennett agreed that these conditions may exist without symptoms but do present a less stable structure which is more susceptible to injury.

The disagreement then was on the basis of medical theory for appellant's chronic low-back residuals. Bennett thought that appellant would have eventually developed low-back problems even if the accident had not occurred. However, he did allow

that appellant could have worked "his entire work life and retired at age 62 and continued like everybody else in retirement, and never had any occurrence of a back injury or a back condition." What is clear is Petrucelli was fine before the accident in 1981 and that the accident alone set the whole total disability situation into motion.

We disagree with the ALJ's conclusion that appellant failed to "tie-in" the fall and "the resultant disability" and that it was "attributable to degenerative changes of the spine which predated the accident, including arthritis, spondylolisthesis, and spondylolysis."

*N.J.S.A.* 34:15A–43 is the statute enabling a public employee who is a member of PERS to retire upon an accidental disability.

> A member who has not attained age 65 shall, upon the application of the head of the department in which he is employed or upon his own application or the application of one acting in his behalf, be retired by the board of trustees, if said employee is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties, on a accidental disability allowance.

The statute further provides that

> [p]ermanent and total disability resulting from a cardiovascular, pulmonary or musculo-skeletal condition which was not a direct result of a traumatic event occurring in the performance of duty shall be deemed an ordinary disability. [*N.J.S.A.* 43:15A–43].

Our Supreme Court engaged in a comprehensive discussion of the history of this provision and the effect of the 1966 amendments in two cases decided on the same day, *Gerba v. Public Employees' Retirem. Sys. Trustees,* 83 *N.J.* 174 (1980) and *Korelnia v. Public Employees' Retirem. Sys. Trustees,* 83 *N.J.* 163 (1980). The 1966 amendment deleted the language that the disability be a "result" of injuries arising out of an employment "accident," substituting the quoted language that the disability constitute the "direct result" of a "traumatic event." The amendment also provided the addition of the language concerning cardiovascular, pulmonary or musculo-skeletal conditions.

As to the meaning of the "direct result" language central to this appeal, the Court stated that "[t]here would seem to be little question that the Legislature by the 1966 amendment of the accidental disability provisions, in its requirement that a disability be the 'direct result' of the employment-related traumatic event, endeavored to impose a more exacting standard of medical causation." *Gerba v. Public Employees' Retirem. Sys. Trustees,* 83 *N.J.* at 185. The Court noted that judicial treatment of the term "direct result" and its relationship to the term "traumatic event" has been "somewhat inconsistent and uncertain" especially in cases where, as here, the disability may be "causally related in some measure to an antecedent or underlying physical condition as well as to the traumatic event." *Ibid.* The Court held that in this regard "what is now required by *N.J.S.A.* 43:15A–43 is a traumatic event that constitutes the essential significant or the substantial contributing cause of the resultant disability." *Id.* at 186. By way of illustration, the Court stated that an underlying condition such as osteoarthritis which itself had not been directly caused, but is only "aggravated" or "ignited" by the traumatic event would give rise to only "ordinary" and not "accidental" benefits. *Id.* Justice Pashman wrote vigorous dissents in both cases, the thrust of which was that the Court's standard, in practice, requires a traumatic event to the *sole* cause of a disability despite the majority's claims to the contrary. 83 *N.J.* 174, 190 (1980) (Pashman, J., dissenting).

Petrucelli argues on appeal, as he did below, that the fall was the sole cause of his disability. He relies on Dr. Mullen's testimony that he suffered a disc lesion as a result of the fall and the subsequent scarring involving the nerve root is the cause of his disabling pain. The ALJ rejected that argument because he found that Dr. Mullen failed to adequately explain how Petrucelli's fall would have resulted in a disc lesion. Alternatively, Petrucelli argues that even were the court to conclude that the spondylolisthesis is involved, the fall constitutes the "essential significant or substantial contributing

cause" of the disability since he was pain-free prior to the accident.

In contrast, the State argues that the ALJ's findings are supported by the record. In its brief, the State characterizes Petrucelli's underlying condition as "asymptomatic preexisting arthritis." It contends that even were the court to find that the fall "aggravated" Petrucelli's arthritis, it would not constitute a medically sufficient cause of his disability as required by *Gerba* and *Korelnia.*

Petrucelli was 49-years old at the time of the accident. Throughout a life characterized by a substantial amount of fairly heavy labor, he had never experienced any problems with his back. After his back was x-rayed following the fall, he learned for the first time that he had spondylolisthesis, a previously nonsymptomatic condition involving a forward slipping of the 5th vertebral body on the first sacral segment.

In *Gerba,* Justice Handler stated that "what is now required by *N.J.S.A.* 43:15A–43 is a traumatic event that constitutes the essential significant or the substantial contributing cause of the resultant disability." 83 *N.J.* at 186. He then says: "As long as the traumatic event is the direct cause, *i.e.,* the essential significant or substantial contributing cause of the disability, it is sufficient to satisfy the statutory standard of an accident disability even though it acts in combination with an underlying physical disease." *Id.* at 187. Justice Handler also points out that "the traumatic event need not be the *sole* or *exclusive* cause of the disability" [emphasis in original] in all instances. *Ibid.* He says again that the triggering event is "an event of a traumatic nature originating from the employment which event constitutes the essential significant or substantial contributing cause of the ultimate disability." *Id.* at 188. The claimant in *Gerba* lost because the undisputed record established that he had symptomatic developmental arthritis for a decade and that the employment event only contributed to the progression of the disease. *Id.* at 189. The companion case *Korelnia,* 83 *N.J.*

at 170, also recognized that in the proper circumstance "an accidental disability may under certain circumstances involve a combination of both traumatic and pathological origins."

In the case before us we conclude that the "direct result" test was legally satisfied. As noted, there was no issue of credibility. Claimant was a very active 49-year-old man performing a strenuous job. He had no prior back problems of any kind. After his severe fall down a nine-step stairway, all concede he is permanently and totally disabled because of his now-symptomatic low-back problem.

For all any one knows, without this accident, Petrucelli could have worked to age 62, as planned, and retired uneventfully. The State's doctor conceded this. Whether he would have developed low-back symptoms independently of the 1981 fall, and when he would have done so, is entirely speculative on this record. We are satisfied that if claimant here cannot recover after a severe trauma, superimposed on a nonsymptomatic structural anomaly, which triggered a symptom complex resulting in total disability, no claimant could ever recover accidental benefits in any circumstance where there exists a quiescent underlying condition which had caused no trouble and might never cause any trouble. We conclude that such a narrow and crabbed "directness" test was never intended by the Legislature nor condoned by the Supreme Court in *Gerba*.

We believe that our construction of the statutory "directness" test, as applied to this case, reasonably effectuates the legislative plan, *see State v. Gill*, 47 *N.J.* 441, 444 (1966), and does not lead to an absurd or unreasonable result. *Ibid.* Moreover, in construing a statute, we need not defer to the administrative agency's judgment. Construction of statutes is a "judicial, not an executive function." *Service Armament Co. v. Hyland*, 70 *N.J.* 550, 561 (1976). *Cf. Close v. Kordulak Bros.*, 44 *N.J.* 589, 599 (1965) (question not of law but of factual basis in record to support agency's determination).

Reversed.