**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2388-15T3

JOSE TORRES,

    Petitioner-Appellant,

v.

BOARD OF TRUSTEES, POLICE AND
FIREMEN'S RETIREMENT SYSTEM,

    Respondent-Respondent.

_____

        Submitted September 12, 2017 — Decided August 3, 2018

        Before Judges Yannotti and Leone.

        On appeal from the Board of Trustees of the
        Police and Firemen's Retirement System,
        Department of Treasury, PFRS No. 3-10-044925.

        Michael J. Hanus, attorney for appellant
        (Thomas De Seno, on the brief).

        Christopher S. Porrino, Attorney General,
        attorney for respondent (Melissa H. Raksa,
        Assistant Attorney General, of counsel;
        Christina Levecchia, Deputy Attorney General,
        on the brief).

PER CURIAM

    Petitioner Jose Torres appeals from the January 11, 2016

decision of the Board of Trustees (Board) of the Police and

Firemen's Retirement System (PFRS). The Board found Torres was qualified for ordinary disability benefits, but was not qualified for accidental disability benefits because his disability was not the direct result of the traumatic event. We affirm.

I.

Except as noted, the following facts were found by the Administrative Law Judge (ALJ) in her October 26, 2016 decision and adopted by the Board. Torres was born in 1958. In 1997, he became a corrections officer for the Department of Corrections (DOC). He was later promoted to senior corrections officer (SCO).

On March 17, 2011, Torres was moving two inmates from a prison to a youth correctional facility. Once at the facility, Torres removed the handcuffs from the first inmate. While Torres was removing the handcuffs from the second inmate, the first inmate began punching the second inmate. As Torres and another corrections officer struggled to control the first inmate, the three fell together to the floor. With the assistance of other officers, the two officers got control of the first inmate.

Torres immediately felt pain in his groin when he stood up. In his report he wrote and signed that day, Torres stated: "In the process of subduing the inmate I pulled something in my left leg." In the portion of a State report he filled out and signed that day, Torres wrote that when he "attempted to subdue inmate, I

pulled something in my left leg." In the section asking him to describe the injury or illness and part of the body affected, Torres wrote "pulled my left leg groin area." In the DOC supervisor's accident/illness investigation report that day, in the portion asking him to describe in detail the injury or illness as reported by the employee, his supervisor wrote that "Torres injured his left groin area." When asked to describe Torres's physical appearance, his supervisor wrote: "Injured his groin area (left side)." Torres testified the supervisor's report reflected what Torres was telling him.

After Torres was transported to the hospital, he complained of pain in his groin and pain or soreness in his neck and shoulder area. The Board cited Torres's testimony that "the groin area was the one that was bothering [him] most at that time." The Board also cited Torres's testimony that, when asked if he "ever ha[d] a pain or stiffness in [his] neck before this incident," he replied: "[s]oreness and all that stuff."

Torres saw workers' compensation doctors, and complained about his neck area. In April 2011, he received an MRI, which showed he was suffering from cervical compression. In November 2011, he had surgery to his cervical spine which fused three discs, added a bone graft, and attached a titanium cage around the discs to support them. He was never able to return to work.

Torres applied for accidental disability retirement benefits. The Board determined Torres was totally and permanently disabled from the performance of his regular and assigned job duties. However, the Board also found his disability was not the direct result of a traumatic event, but was the result of a pre-existing disease. Consequently, the Board granted him ordinary disability benefits but denied accidental disability benefits.

Torres sought a hearing. The Board transferred the matter to the Office of Administrative Law, and an ALJ held hearings. On October 26, 2015, the ALJ found that Torres had carried his burden, and concluded he should be awarded accidental disability retirement benefits.

The Board reviewed the ALJ's recommended decision. On January 11, 2016, the Board modified the ALJ's findings of fact, and rejected the ALJ's determination that Torres was entitled to accidental disability benefits. Torres appeals.

## II.

We must hew to our standard of review. Judicial "review of administrative agency action is limited. 'An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27

(2011) (citations omitted). The Board and similar "agencies have 'expertise and superior knowledge . . . in their specialized fields.'" <u>Hemsey v. Bd. of Trs., Police & Fireman's Ret. Sys.</u>, 198 N.J. 215, 223 (2009) (citation omitted). "An appellate court affords a 'strong presumption of reasonableness' to an administrative agency's exercise of its statutorily delegated responsibilities." <u>Lavezzi v. State</u>, 219 N.J. 163, 171 (2014) (citation omitted). "A reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'" <u>In re Stallworth</u>, 208 N.J. 182, 194 (2011) (citation omitted).

## III.

The Board disagreed with and modified some of the ALJ's factual findings. As a result, we must consider the Board's standard of review over the ALJ's decision under the Administrative Procedures Act, N.J.S.A. 52:14B-1 to -15. <u>Union v. Police & Firemen's Ret. Sys.</u>, 170 N.J. Super. 411, 414 (App. Div. 1979); N.J.A.C. 17:4-1.7. N.J.S.A. 52:14B-10(c) provides:

> In reviewing the decision of an administrative law judge, the agency head may reject or modify findings of fact, conclusions of law or interpretations of agency policy in the decision, but shall state clearly the reasons for doing so. The agency head may not reject or modify any findings of fact as to issues of credibility of lay witness testimony unless it is first determined from a review of the

record that the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record. In rejecting or modifying any findings of fact, the agency head shall state with particularity the reasons for rejecting the findings and shall make new or modified findings supported by sufficient, competent, and credible evidence in the record.

It is not contended that the Board rejected or modified the ALJ's findings regarding the credibility of the only lay witness, Torres. Rather, the Board simply cited and credited parts of Torres's testimony the ALJ had not cited.

Thus, the Board need only "state clearly [its] reasons for" rejecting or modifying the ALJ's "findings of fact, conclusions of law or interpretations of agency policy," "state with particularity the reasons for rejecting" any findings of fact, and "make new or modified findings supported by sufficient, competent, and credible evidence in the record." Ibid.

The ALJ found "that SCO Torres was not experiencing any kind of symptoms before the fall occurred." The ALJ reached that finding "based on the credible testimony of SCO Torres and the lack of any medical documentation to support the existence of any symptoms before the accident," and because "[h]e was living an active life, which included running and gym work, along with the physical demands of corrections work." The Board explained it

rejected the ALJ's finding because Torres testified he had "[s]oreness and all that stuff" in his neck prior to the incident. Thus, the Board offered an adequate explanation based on sufficient, competent, and credible evidence.

Torres notes there was no medical evidence the soreness in his neck before the incident was more than the simple aches that come with a physical job. However, the Board could draw a reasonable inference that the "[s]oreness and all that stuff" Torres suffered in his neck was the result of Torres's significant degenerative cervical spinal stenosis, given the substantial post-incident medical evidence of that pre-existing condition.

The ALJ also heard the testimony of Torres's orthopedics expert, Dr. David Weiss, and the Board's expert in orthopedics surgery, Dr. Arnold Berman. The Board found both experts agreed that before the incident, Torres already had multi-level degenerative disc disease in his neck and spinal stenosis, meaning compression of the spinal cord, which Dr. Weiss termed significant and Dr. Berman found was very advanced. The Board also found both experts agreed Torres did not injure his spine or his spinal canal during the incident, but just sustained a "strain and sprain" of his neck, a "soft-tissue, muscular injury." Torres does not challenge those findings.

Instead, Torres cites Dr. Weiss's testimony that Torres "developed a post-traumatic myelopathy," meaning a softening of the spinal cord. However, it was undisputed that the first post-incident MRI did not show any evidence of myelopathy, and that he did not develop myelopathy until a few months later. Dr. Weiss testified that Torres could have developed myelopathy without the trauma, but that the timing of its occurrence after the incident led him to conclude it was related to the incident.

In adopting Dr. Weiss's conclusion, the ALJ cited Dr. Weiss's reasoning that Torres was "asymptomatic" and he "never had a problem or a diagnosis of a myelopathy before the injury. So as such, the myelopathy follows the direct surgery" and is "directly attributable to that." The ALJ stressed that "Torres had no symptoms," and that "the absence of symptoms at the time of the incident, the absence of myelopathy at the time of the accident, and the fact that it took the significant problems some time to develop after the accident all count as proof that the serious problems were caused by" the incident. However, as the Board found, Torres's testimony that he had had "[s]oreness and all that stuff" in his neck showed he was not asymptomatic before the incident, undermining Weiss's testimony and the ALJ's findings.

Dr. Berman testified that myelopathy would "almost never" be caused by an acute injury, that it was caused by the degenerative

spinal stenosis, and that surgery was needed because of the structural changes to Torres's spine pre-dating the incident. Dr. Berman stated it was a "most fortunate occurrence that he had this soft tissue injury and they discovered this severe problem . . . because otherwise it might have taken him years longer before he had the operation and he would just have put up with it."

The ALJ found that Dr. Berman contradicted himself in that statement, and "therefore" that degeneration was likely to be slow absent the incident. The Board rejected those findings. The Board cited the experts' agreement that "Torres had significant or advanced pre-existing degenerative spinal stenosis or compression of the spinal cord, and [that] the compression was the reason for Torres's surgery." The Board also cited "Dr. Weiss's own testimony that Torres's surgical procedure is performed to preserve function rather than restore function." The Board added that "the soft tissue injury led to the discovery of the advanced or significant degenerative process of compression of Torres's spine and the surgery was performed to preserve the level of functioning" Torres had at the time of surgery. That was a sufficient explanation for rejecting the ALJ's findings.

Torres argues Dr. Berman could not explain why Torres never had a complaint in any medical record before the incident. To the contrary, Berman believed that Torres had symptoms but was a "tough

guy" who put up with them without seeking medical help. Torres's testimony was consistent with Berman's view. Berman opined Torres did not know how significant his spinal stenosis was or else "he would have been taken care of a long time ago."

Torres contends Dr. Berman "truly contradicted himself" by testifying the myelopathy pre-existed the incident. However, Berman testified he viewed spinal stenosis and myelopathy as "the same thing" in this case because they both involved pressure on and compression of the spinal cord. Berman ultimately clarified that the stenosis was the cause, the myelopathy was the result, and the "cervical spine symptoms" pre-existed the incident. In any event, the Board found the spinal stenosis pre-existed the incident, and the myelopathy was diagnosed by the surgeon seven months later.

Thus, the Board's detailed decision clearly stated with particularity its reasons for rejecting or modifying the ALJ's findings of fact, and its modified findings were supported by sufficient, competent, and credible evidence in the record.

IV.

Based on its modified factual findings, the Board rejected the ALJ's legal analysis and conclusion that Torres was eligible for accidental disability retirement benefits. Courts "apply de novo review to an agency's interpretation of a statute or case

law." <u>Russo</u>, 206 N.J. at 27.  However, "courts afford substantial deference to an agency's interpretation of a statute that the agency is charged with enforcing."  <u>Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys.</u>, 192 N.J. 189, 196 (2007).  "'Such deference has been specifically extended to state agencies that administer pension statutes,' because '"a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise."'"  <u>Thompson v. Bd. of Trs., Teachers' Pension & Annuity Fund</u>, 449 N.J. Super. 478, 483-84 (App. Div. 2017) (citation omitted), <u>aff'd o.b.</u>, __ N.J. __ (2018).

"[A]n accidental disability retirement entitles a member to receive a higher level of benefits than those provided under an ordinary disability retirement."  <u>Patterson v. Bd. of Trs., State Police Ret. Sys.</u>, 194 N.J. 29, 43 (2008).  A PFRS "member can qualify for ordinary disability benefits if he is disabled for any reason; the disability need not have a work connection."  <u>Russo</u>, 206 N.J. at 28.  By contrast, a PFRS member is not eligible to "be retired on an accidental disability retirement allowance" unless "the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties."  N.J.S.A. 43:16A-7(1).

In Richardson, our Supreme Court found that "the Legislature intended in adopting the language of N.J.S.A. 43:16A-7[(1)] to excise disabilities that result from pre-existing disease alone or in combination with work effort from the sweep of the accidental disability statutes." 192 N.J. at 192. Thus, the Court held that, to obtain accidental disability benefits, a person must prove:

> 1. that he is permanently and totally disabled;
>
> 2. as a direct result of a traumatic event that is
>
>> a. identifiable as to time and place,
>>
>> b. undesigned and unexpected, and
>>
>> c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
>
> 3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;
>
> 4. that the disability was not the result of the member's willful negligence; and
>
> 5. that the member is mentally or physically incapacitated from performing his usual or any other duty.
>
> [Id. at 212-13.]

The only disputed prerequisite here is whether Torres was permanently and totally disabled "as a direct result of a traumatic

event that is . . . caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work)."  Ibid.  Torres was required to prove that his disability is "a direct result of [the] traumatic event" and "is not the result of pre-existing disease alone or in combination with work effort."  Id. at 212.

The facts in Richardson involved a disability caused solely by a traumatic event.  "While performing the regular tasks of his job as a corrections officer, subduing an inmate, Richardson was thrown to the floor and hyperextended his wrist.  As a direct result, he became permanently and totally disabled."  Id. at 214. "[A]n MRI revealed a complete tear of the ligament.  Surgery to repair the ligament was unsuccessful," and Richardson was disabled.  Id. at 193.

Here, by contrast, subduing the inmate only caused Torres a groin injury and a sprain and strain of his neck, soft-tissue injuries which soon healed.  Richardson requires that an applicant for accidental disability benefits meet "an extraordinarily high threshold that culls out all minor injuries; all major injuries that have fully resolved; all partial or temporary disabilities; and all cases in which a member can continue to work in some other capacity."  Id. at 195; see Thompson, 449 N.J. Super. at 487.

13                                                    A-2388-15T3

The Board found medical tests given during the treatment for those temporary injuries revealed that Torres had a pre-existing degenerative disease, spinal stenosis, which had given him soreness and other problems with his neck before the incident, and which degenerated further into myelopathy months after the incident. However, revelation is not causation. A "member who has experienced a qualifying traumatic event must prove that the event, <u>in fact</u>, caused him to be permanently and totally disabled." <u>Russo</u>, 206 N.J. at 32.

The ALJ cited examples of traumatic and non-traumatic events given in <u>Richardson</u>:

> [1] a police officer who has a heart attack while chasing a suspect has not experienced a traumatic event. In that case, the work effort, alone or in combination with pre-existing disease, was the cause of the injury. [2] However, the same police officer, permanently and totally disabled during the chase because of a fall, has suffered a traumatic event. [3] Similarly, the gym teacher who develops arthritis from the repetitive effects of his work over the years has not suffered a traumatic event. His disability is the result of degenerative disease and is not related to an event that is identifiable as to time and place. [4] On the contrary, the same gym teacher who trips over a riser and is injured has satisfied the standard.
>
> [<u>Richardson</u>, 192 N.J. at 213 (numeration added).]

Torres's case poses a different situation. Unlike the first and third examples, Torres experienced a traumatic event. Unlike the second and fourth examples, Torres was not "permanently and totally disabled . . . because of a fall." Ibid. Rather, the Board found treatment for the fall revealed his degenerative disease, and "[h]is disability is the result of [the] degenerative disease," making Torres's situation more akin to the first and third examples. Ibid.

The ALJ also cited pre-Richardson cases, Cattani v. Bd. of Trs., Police & Firemen's Ret. Sys., 69 N.J. 578 (1976), Gerba v. Bd. of Trs., Pub. Employees' Ret. Sys., 83 N.J. 174, 181 (1980), and Petrucelli v. Bd. of Trs., Pub. Employees' Ret. Sys., 211 N.J. Super. 280 (App. Div. 1986). In Cattani, the Court observed that "a basis for an accidental disability pension would exist if it were shown that the disability directly resulted from the combined effect of a traumatic event and a preexisting disease." 69 N.J. at 586. The Court molded that observation into a test in Gerba:

> This observation was intended simply to underscore the point that an accidental disability in some circumstances may arise even though an employee is afflicted with an underlying physical disease bearing causally upon the resulting disability. In such cases, the traumatic event need not be the sole or exclusive cause of the disability. As long as the traumatic event is the direct cause, i.e., the essential significant or substantial contributing cause of the disability, it is

> sufficient to satisfy the statutory standard of an accidental disability even though it acts in combination with an underlying physical disease.
>
> [83 N.J. at 187 (emphasis added).]

However, the ALJ did not find that the incident was "the essential significant or substantial contributing cause of the disability." Ibid. Instead, the ALJ stressed the temporal sequence: "One day, SCO Torres was living an active life and working; the next day, the accident occurred, and seven months later, he required complex surgery." However, "[t]he fact that total disability followed the muscle strain chronologically does not necessarily mean that it was 'as a result' thereof. To hold otherwise would be to adopt the false logic of 'Post hoc, ergo propter hoc.'" Schulman v. Male, 70 N.J. Super. 234, 240 (App. Div. 1961); see Black's Law Dictionary 1285 (9th ed. 2009) (translating "post hoc, propter hoc" as "after this, therefore because of this," and defining it as "the fallacy of assuming causality from temporal sequence"). The Board properly rejected this "incorrect analysis."

The ALJ relied primarily on Petrucelli. After Petrucelli fell down a stairwell, he had disabling back pain. 211 N.J. Super. at 283, 285. His "quiescent, non-symptomatic arthritic and structural changes" in his back "were activated into painful

16

symptomatology as a result of the severe fall." Id. at 284-85. We found the fall satisfied Gerba's "essential significant or substantial contributing cause" standard. Id. at 287-89. We pointed out that "[a]ll the doctors agreed that the traumatic event . . . initiated the pain." Id. at 284-85. We stressed that his pre-existing condition was "quiescent," "asymptomatic" and "nonsymptomatic." Id. at 284-85, 288-89. We repeatedly emphasized that "[t]he doctors all agreed that Petrucelli's past medical history was completely negative for any back problems. There is not a shred of a suggestion in the record that he had had back pain or back symptoms of any kind before the accident." Id. at 284-85.

The ALJ asserted "[l]ike Petrucelli, SCO Torres was nonsymptomatic." As a result, the ALJ concluded that "the similarity of the facts to those in Petrucelli compels a conclusion that the accident was the substantial, significant cause of the disability, such that [Torres] has demonstrated his eligibility for a disability retirement."

However, the Board found the "[s]oreness and all that stuff" Torres suffered in his neck before the incident was the result of his degenerative cervical spinal stenosis. Therefore, unlike Petrucelli, Torres was not asymptomatic, had neck pain and neck problems, and his spinal stenosis was not quiescent before the

incident. Moreover, the Board pointed out that Petrucelli's pre-existing condition was "stable, unlike Torres's spinal stenosis, which both Dr. Berman and Dr. Weiss agree[d] is progressive and in some cases progressive to myelopathy." Thus, the Board properly rejected the ALJ's reliance on Petrucelli. See Estate of Terminelli v. Police & Firemen's Ret. Sys., 290 N.J. Super. 231, 234 (App. Div. 1996) (distinguishing Petrucelli because "Terminelli had a preexisting symptomatic coronary artery disease, which was aggravated by the February 3 incident"), aff'd o.b., 148 N.J. 433 (1997).

Moreover, the Board cited Dr. Weiss's diagnosis that after the strain and sprain, Torres "had an aggravation of pre-existing quiescent age-related multi-level degenerative disc disease and osteoarthritis of the cervical spine." The Board found "Torres's underlying 'advanced' or 'significant' degenerative spinal stenosis, was 'aggravated' or 'ignited' by the incident, and was not caused by it, thus making Torres's case more akin to Gerba than Petrucelli."

In Gerba, our Supreme Court ruled that "[w]here there exists an underlying condition such as osteoarthritis which itself has not been directly caused, but is only aggravated or ignited, by the trauma, then the resulting disability is, in statutory parlance, 'ordinary' rather than 'accidental' and gives rise to

'ordinary' [disability] pension benefits." <u>Gerba</u>, 83 N.J. at 186. The Court upheld the Board's rejection of an accidental disability claim where "the traumatic event contributed to the progression of [the pre-existing] condition . . . by aggravation." <u>Id.</u> at 189.

In <u>Korelnia v. Bd. of Trs., Pub. Empls.' Ret. Sys.</u>, 83 N.J. 163 (1980), the Court followed <u>Gerba</u> and remanded for the member to show "that trauma constituted either the essential significant or the substantial contributing cause of the ultimate disability," rather than that "the traumatic event only ignited or aggravated an underlying osteoarthritic condition without constituting a medically sufficient cause thereof." <u>Korelnia</u>, 83 N.J. at 165, 169-72.

The Court in <u>Richardson</u> cited <u>Gerba</u> favorably. <u>Richardson</u>, 192 N.J. at 196-97. The Court acknowledged "the members in <u>Gerba</u> and <u>Korelnia</u> were both denied accidental disability pensions on medical causation grounds" despite suffering "traumatic events." <u>Id.</u> at 203. The Court held that <u>Gelba</u>, <u>Korelnia</u>, and <u>Cattani</u> had the "correct" "view of legislative intent" regarding traumatic events. <u>Id.</u> at 211-12.

Therefore, the "exacting standard of medical causation" established in <u>Gelba</u> governs. 83 N.J. at 185. The Board's finding that Torres failed to meet that standard was not arbitrary,

capricious, or unreasonable, and had fair support in the record. "Where, as here, the determination is founded upon sufficient credible evidence seen from the totality of the record and on that record findings have been made and conclusions reached involving agency expertise, the agency decision should be sustained." Id. at 189.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION