**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1431-24

JUAN M. GARABITO,

      Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
POLICE AND FIREMEN'S
RETIREMENT SYSTEM,

      Respondent-Respondent.

_____

Submitted January 21, 2026 – Decided March 13, 2026

Before Judges DeAlmeida and Torregrossa-O'Connor.

On appeal from the Board of Trustees of the Police and Firemen's Retirement System, Department of the Treasury, PFRS No. xx3419.

Limsky Mitolo, attorneys for appellant (Marcia J. Mitolo, on the briefs).

Gregory Petzold, Executive Director of Legal Affairs, attorney for respondent (Thomas R. Hower, Staff Attorney, on the brief).

PER CURIAM

Petitioner Juan M. Garabito appeals from the January 15, 2025 final agency decision of respondent Board of Trustees, Police and Firemen's Retirement System of New Jersey (Board), denying his application for accidental disability benefits pursuant to N.J.S.A. 43:16A-7. After reviewing the record in light of applicable law, we affirm.

I.

A. The Work-Related Injury and Initial Denial of Accidental Disability

On November 20, 2020, petitioner, a thirty-four-year-old Hudson County Correctional Center (HCCC) corrections officer assigned to the mental health unit, was attacked by an inmate. At the time of the incident, petitioner had been a corrections officer for twelve years. He described his duties in the mental health unit as including "escort[ing]," "feed[ing]," and "distribut[ing] medication with the nurse and just observ[ing to] make sure there's no altercations." The attack occurred while petitioner "was removing inmate food trays from inmate cells after breakfast." Petitioner approached a particular cell, when the inmate "attacked [him] with [a] food tray" leading to "a physical struggle" on the floor. Petitioner reported immediately "experien[c]ing pain in [his] left shoulder." He received surgery in February 2021 and was later cleared

for light duty, but petitioner continued to report significant difficulties completing household tasks such as lifting and carrying small objects.

In late 2021, petitioner applied for accidental disability benefits after his "doctor determine[d] that [he] c[ould] only perform light[ ]duty level work," and "[his] employer w[ould] not accommodate [him] with a permanent light duty position." The Board denied petitioner's request for accidental disability benefits, pursuant to N.J.S.A. 43:16A-7, but granted him ordinary disability benefits by letter dated October 18, 2022. Despite finding petitioner had met all other requirements to receive accidental disability benefits,[1] the Board advised

---

[1] The Board summarized its findings, advising petitioner:

> The Board determined that you are totally and permanently disabled from the performance of your regular and assigned job duties.
>
> Further, the Board found that you are physically or mentally incapacitated from the performance of your usual or other duties that your employer is willing to offer.
>
> The documentation indicates that the event that caused your reported disability is identifiable as to time and place.
>
> The Board found that the event that caused your reported disability is undesigned and unexpected.

it determined, "Although the event [wa]s caused by an external circumstance, the medical documentation provided indicate[d] that [petitioner's] reported disability [wa]s the result of a pre-existing disease alone or a pre-existing disease that is aggravated or accelerated by the work effort."

B. The Appeal and Hearing

Petitioner appealed the Board's decision and was granted a hearing, which took place over two days before an administrative law judge (ALJ). Prior to the hearing, the parties stipulated to the majority of the Board's findings, agreeing the altercation "occur[red] during and as a result of petitioner's regular and assigned duties," was "identifiable as to time and place," "undesigned, and unexpected," "was not the result of [petitioner's] willful negligence," and left petitioner "totally and permanently disabled from the performance of petitioner's regular and assigned job duties . . . or other duties that [his] employer [wa]s willing to offer."

---

The Board noted that the event occurred during and as a result of your regular or assigned duties.

Based upon the documentation provided, your reported disability is not the result of your willful negligence.

4

Thus, the sole issue at the hearing concerned the nature and extent of any causal link between the attack and petitioner's injury. The record included testimony and reports from petitioner's medical expert, Dr. David Weiss, and the Board's expert, Dr. Jeffrey Lakin, as well as the entirety of petitioner's medical records, which were admitted without objection.

1. Petitioner's Medical Records and Prior History

Petitioner's medical and employment records reflected a history of left shoulder injuries. On June 19, 2015, petitioner received debridement[2] surgery on his left shoulder to repair a torn labrum. Petitioner's surgeon, Dr. Michael Gross, reported petitioner had "a large flap tear from the [one] o'clock to the [three] o'clock position." Dr. Gross further noted "[t]he labrum was meticulously debrided leaving a smooth, well-balanced, stable, contoured labral rim."

The records included an August 26, 2017 HCCC incident report stating petitioner was transported to the hospital after he "pulled [his] shoulder" attempting to open a broken door at the facility. The hospital records noted left

---

[2] Petitioner's expert defined a shoulder debridement as a procedure in which the surgeon "remove[s] enough tissue" to achieve a "stable rim" with "no hardware" when a "tear [i]s not significant enough to warrant any reconstruction." The Board's expert agreed a debridement would be appropriate when there is "just fraying of the tissue."

shoulder "instability" and "pain," as well as a "strain," but revealed petitioner was released back to work to complete the remainder of his shift with minor restrictions.

In the following months, petitioner reported pain, and physical therapy was recommended. MRI reports dated September 9 and November 13, 2017, reflected no labral tear.

In the summer of 2019, petitioner reported "spontaneous onset of pain at the left shoulder" to Dr. Samuel Snyder. An x-ray showed "no abnormalities," and Dr. Snyder could not "establish any causal relationship for [petitioner's] current spontaneous complaints of pain." Petitioner was diagnosed by Dr. Snyder with "[i]mpingement syndrome of [the] left shoulder"; "[b]ursitis"; and a muscle "[s]train." Dr. Snyder concluded petitioner "remain[ed] at maximum medical improvement with respect to his [2017] accident" and could "continue his full job responsibilities without restrictions." Additionally, a September 3, 2019 MRI reported "[b]lunting and scarring along the periphery of the posterior labrum" and "[n]o discrete tear." An appointment note from Dr. Gross dated January 22, 2020, indicated petitioner was still experiencing pain.

Relevant here, hospital records from November 20, 2020, reflect petitioner was treated for a "[l]eft shoulder strain" and prescribed physical

6

therapy after "grappling with an inmate." Those records indicate petitioner was released and able to "[r]eturn to work" the following day with minimal restrictions. Over the next month, petitioner continued to describe pain at follow up appointments and reported an "[inability] to do small task[s] like opening doors or even leaning on [his left shoulder]." An MRI report dated December 9, 2020, reported "undercutting [of] the superior labrum, which may represent a tear" and a "somewhat diminutive" "[a]nterosuperior labrum."

On December 24, 2020, Dr. Adam Bernstein, an orthopedic surgeon, evaluated petitioner and reported "[petitioner] indicate[d] the left shoulder was never fully asymptomatic after his 2017 injury but he was able to return to work and activities of daily living." Petitioner "indicate[d] . . . his symptoms and function ha[d] severely worsened" after his November 2020 injury; however, Dr. Bernstein opined "[t]he situation is confounded by his history of prior work injury in 2017."

A January 31, 2021 arthrogram MRI of petitioner's left shoulder revealed a "[f]ocal tear of the superior labrum at the labral cartilaginous junction at the approximate [twelve] o'clock position of the glenoid just posterior to the biceps labral complex . . . [with] [b]lunting along the periphery of the posterior labrum." The following month, Dr. Bernstein performed surgery on petitioner's

left shoulder, finding "significant irregularity" in the anterior superior labrum "measured from approximately the [ten] o'clock and [eleven] o'clock position on the left shoulder" and "the anterior inferior labrum had tearing." Dr. Bernstein noted that "the anterior superior labrum[,] . . . the area of prior labral debridement[,] . . . appear[ed] pristine and well attached." Over the following six months, petitioner reported continued pain and inability to carry small household objects.

A report summarizing an August 2021 Kinematic Functional Capacity Evaluation (FCE) of petitioner noted "residual shoulder dysfunction," but stated petitioner may have "portray[ed] less than maximum effort for this evaluation." Dr. Bernstein reviewed petitioner's FCE results and observed petitioner "was found to have the capacity for light duty work with lifting and pushing up to [twenty] pounds" and advised "[t]hese restrictions should be considered permanent." On October 27, 2021, Dr. Bernstein completed a "Medical Examination by Personal or Treating Physician" form deeming petitioner "now totally and permanently disabled and no longer able to perform his . . . job duties" as a result of "pain" and "loss of motion."

2. <u>Hearing Testimony</u>

Petitioner contended his 2020 injury was not a direct result of a pre-existing condition because, after his 2015 surgery, "he worked without limitation and continued normal activity for almost two years [before] he suffered a mild shoulder sprain in 2017 . . . that did not cause any reinjury in the form of tearing." He explained, despite his 2021 surgery, he "still can't lift [his] arm" or "use it the way [he] want[s] to use it," citing his inability to play basketball and softball or "any activity that [he] wanted to do on a daily basis" due to both decreased "[r]ange of motion and pain." Petitioner discussed each of his prior injuries, emphasizing each time he returned to work in the aftermath without restrictions feeling "normal" and "perfectly fine." Petitioner testified any interim injuries between 2015 and 2020 were just "strain[s]" and, "[f]rom 2015 to 2019, [he] had no problem until [he] started feeling in . . . late 2019, the little pain in [his] shoulder."

Petitioner also presented the testimony of his expert, Dr. David Weiss, a board-certified clinical orthopedic surgeon. In his August 9, 2023 independent medical evaluation report, Dr. Weiss noted petitioner's range of motion was "restricted." The doctor acknowledged petitioner had suffered prior injury to his left shoulder but found "[petitioner] was having no issues involving his

9

activities of daily living," and petitioner's November 2020 injury "directly impacted [his] . . . abilities to perform his activities of daily living" which is "consistent with a permanent disability." Dr. Weiss opined "[petitioner] is . . . totally and permanently disabled as a corrections officer" which is "[t]he substantial and direct result of . . . the traumatic event of the work[-]related injury of November 20, 2020."

Dr. Weiss testified his examination revealed significant deficits in petitioner's range of motion. Noting petitioner's 2015 surgery was "a simple debridement" with no need for "labral reconstruction," Dr. Weiss cited petitioner's subsequent negative MRIs and opined, "In [20]17[,] [petitioner] had a brief exacerbation due to the prior surgery" that "resolved." Dr. Weiss distinguished an "exacerbation" from an "aggravation," explaining with an "aggravation . . . [y]ou never come back to your baseline again" while with "exacerbation[,] . . . [y]ou come back to the same level that you were" before the exacerbation and after the initial injury. Dr. Weiss noted after petitioner's injury "in [20]17, he did return back to his baseline," as evidenced by his "doctor sen[ding] him back to work full time with no restrictions."

With regard to petitioner's surgery following the November 2020 injury, Dr. Weiss admitted "[y]ou can't deny [petitioner] ha[d] prior issues with the

shoulder" but explained his condition did not "r[i]se to the level of needing reconstruction." He added petitioner was "[five] years with a minor exacerbation [and] . . . MRI studies that . . . were completely normal until . . . the traumatic injury in [20]20 where . . . [he] need[ed] a complete reconstruction" with "hardware." Dr. Weiss concluded, after "looking at the first surgery [and] comparing it to the second surgery" as well as petitioner's MRI scans, "the November 2020 event would be the substantial cause."

In contrast, Dr. Jeffrey Lakin, the Board's orthopedic expert, testified petitioner's total disability was not a direct result of the 2020 injury. As memorialized in his May 3, 2022 report prepared following his evaluation of petitioner, Dr. Lakin noted petitioner's "left shoulder pain did not improve following the [2021] surgery," and he "ha[d] difficulty" with a variety of daily tasks and was "symptomatic to his left shoulder and had treatment prior to the work-related accident of 11/20/[20]20." He observed a decreased range of motion in petitioner's left shoulder rendered petitioner "totally and permanently disabled from the performance of the normal duties of his job," but further opined this was an "aggravation of a preexisting condition" and "not a direct result of the work-related accident of 11/20/[20]20."

A-1431-24

Dr. Lakin testified petitioner's labral tear in 2015 "wasn't surgically repaired, it was just debrided." The doctor noted petitioner also had "inflammation" and "arthritis" in his shoulder joint. He indicated "based on [his] review of the records[,] [petitioner] continue[d] to exhibit symptoms in the left shoulder after [the 2017 injury] and prior to the subject incident" in November 2020, noting petitioner's complaints of pain in 2019 and early 2020. Dr. Lakin described his review of the September 3, 2019 MRI which noted "capsular laxity," which results "when the labrum is stretched out or it's torn." He explained "the best way to see" a tear would be "intraoperatively."

Regarding the November 2020 injury, Dr. Lakin explained that petitioner's surgeon "saw that there was arthritis" in the left shoulder, which "doesn't happen acutely, it's something that's worn down over a long period of time." Dr. Lakin concluded "the major contributing factor [to petitioner's total disability] was a pre-existing injury to [petitioner's] shoulder where he had a large labral tear that was never repaired and he was still symptomatic even at the year . . . of this accident." Dr. Lakin explained, "[petitioner] had a severe shoulder pathology that wasn't repaired . . . [it was] just debrided, so eventually he was going to be disabled at some point in time regardless." He posited the

2020 labral tear "was present since 2015," and petitioner's return to work subsequent to the 2017 and 2019 injuries did not undermine that conclusion.

### 3. The Hearing Decision and Final Board Determination

By detailed written decision dated November 22, 2024, in which she set forth the procedural and factual history, as well as the testimony and medical evidence, the ALJ affirmed the Board's decision denying petitioner's request for accidental disability benefits. The ALJ clarified "[t]he pivotal issue" was "whether [petitioner's] reported disability was the result of a pre-existing disease alone or a pre-existing disease that was aggravated or accelerated by the work effort." The ALJ found the latter, crediting the Board's expert.

Assessing "the strength of the competing expert testimony," the ALJ found "the scales tip[ped] in favor of [Dr.] Lakin'[s]" opinions over Dr. Weiss's. She found Dr. "Lakin's testimony to be credible, persuasive, and consistent with other offered evidence," and noted his "conclusions . . . were not significantly impaired by counsel's thorough cross-examination." Valuing Dr. Lakin's reliance on "objective measures rather than simply relying on [petitioner's] self-reports," the ALJ further found Dr. "Lakin credibly explained that [petitioner] had severe shoulder pathology and a large structural problem caused by a pre-existing condition." Thus, she accepted his testimony opining "[p]rior to the

A-1431-24

November 20, 2020 incident, [petitioner] 'had a large labral tear that was never repaired' and 'was just debrided.'"

The ALJ concluded it was unclear to what extent Dr. Weiss reviewed petitioner's medical records between petitioner's 2015 and 2020 injuries and noted "substantial doubt regarding the reliability and accuracy of [petitioner's] reporting to [Dr.] Weiss."  The ALJ also found Dr. Weiss's testimony petitioner had only "minor exacerbation" from 2015 to 2020 was not accurate, as "the record paint[ed] a different portrait."  The ALJ noted several instances of petitioner's complaining of "severe pain" in 2017, 2019, and 2020.  The ALJ concluded "the records undermine[d] [petitioner's] testimony that after the 2019 injury, even though he was having pain, he was able to work 'perfectly fine,' he 'did daily life perfectly fine,' and 'everything was normal.'"

The ALJ acknowledged the MRIs between the major injuries showed no labral tear, and noted petitioner's argument that "the November 20, 2020 incident caused damage to a portion of his labrum that had not been previously damaged" based on differing locations of the 2015 and 2020 noted injuries.[3]  However, the ALJ found petitioner's arguments unpersuasive reasoning "this

---

[3]  Notably, Dr. Gross's 2015 Operative Report and Dr. Bernstein's 2021 Operative Report were included in the ALJ's "List of Exhibits in Evidence."

issue was never identified as a basis for [Dr. Weiss's] opinions," nor "was [it] addressed during [petitioner's] cross-examination of [Dr.] Lakin."

The ALJ emphasized petitioner "was not asymptomatic [and] exhibited symptoms related to his shoulder condition for many years before" the 2020 incident. Further, she cited "Dr. L[a]kin's credibl[e] testi[mony] that it was only 'going to be a matter of time' until [petitioner] would be unable to carry out his job duties because he had already developed traumatic arthritis to his shoulder from the 2015 injury." Therefore, the ALJ concluded "[petitioner] failed to meet his burden of establishing, by a preponderance of the credible evidence, that the November 20, 2020 incident was the essential significant or substantial contributing cause of his resulting total and permanent disability."

By letter dated January 15, 2025, the Board advised petitioner it considered and adopted the ALJ's decision affirming the "denial of [petitioner's] application for [a]ccidental [d]isability retirement benefits."

II.

A.

On appeal, petitioner argues the Board erred because the evidence demonstrated the 2020 incident was the essential, significant, or substantial contributing cause of his total and permanent disability. Petitioner maintains

15

his 2015 "prior injury, regardless of whether or not it presented an occasional exacerbation, was not permanently disabling to [petitioner]," as demonstrated by his continuing ability to work in "full capacity" prior to the November 2020 incident. Further, petitioner argues the Board is "not entitled to substantial deference" in this matter "[a]s this is strictly a legal issue." Petitioner further asserts his expert's qualifications and opinions were superior and more persuasive than the Board's expert's and the court incorrectly credited and relied upon Dr. Lakin's opinions.

B.

"We review a decision made by an administrative agency entrusted to apply and enforce a statutory scheme under an enhanced deferential standard." E. Bay Drywall, LLC v. Dep't of Lab. & Workforce Dev., 251 N.J. 477, 493 (2022). Accordingly, we will "not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Virtua-West Jersey Hosp. Vorhees for a Certificate of Need, 194 N.J. 413, 422 (2008); see also Sullivan v. Bd. of Rev., Dep't of Lab., 471 N.J. Super. 147, 155-56 (App. Div. 2022). The burden to show an agency's abuse of discretion

"is on the challenger." Parsells v. Bd. of Educ., 472 N.J. Super. 369, 376 (App. Div. 2022).

In reviewing an agency's decision, "the test is not whether [we] would come to the same conclusion if the original determination was [ours] to make, but rather whether the factfinder could reasonably so conclude upon the proofs." Brady v. Bd. of Rev., 152 N.J. 197, 210 (1997) (quoting Charatan v. Bd. of Rev., 200 N.J. Super. 74, 79 (App. Div. 1985)). Further, we afford "[w]ide discretion . . . to administrative decisions because of an agency's specialized knowledge." In re Request to Modify Prison Sentences, 242 N.J. 357, 390 (2020). On review, we consider:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995) (citing Campbell v. Dep't of Civ. Serv., 39 N.J. 556, 562 (1963)).]

The governing law related to police and fire disability benefits is set forth in Chapter 16A of Title 43. N.J.S.A. 43:16A-1 to -68. Pertinent here, N.J.S.A. 43:16A-7 specifically sets forth the requirements for a member to receive

retirement benefits for accidental disability. The statute provides in relevant part:

> Any member may be retired on an accidental disability retirement allowance, provided that the medical board, after a medical examination of such member, shall certify that <u>the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties</u> . . . .
>
> [N.J.S.A. 43:16A-7(a)(1) (emphasis added).]

Although generally "a pre[-]existing condition or disease in combination with other employment-related factors might not constitute an 'accidental disability'[,]" "sufficient medical cause [can be satisfied by] a traumatic event that constitutes <u>the essential significant or the substantial contributing cause</u> of the resultant disability." Gerba v. Bd. of Trs., Pub. Emps.' Ret. Sys., 83 N.J. 174, 184, 186 (1980) (emphasis added); see also Petrucelli v. Bd. of Trs., Pub. Emps.' Ret. Sys., 211 N.J. Super. 280, 287 (App. Div. 1986).[4] The statute's use of "[t]he word 'direct' connotes relative freedom from remoteness, whether in terms of time, intervention of other contributive causes or the like, or a combination of such factors." Gerba, 83 N.J. at 186 (quoting Titman v. Bd. of

---

[4] These cases refer numerically to a different statute due to subsequent re-numbering and ordering of the statute.

Trs., Tchrs.' Pension & Annuity Fund, 107 N.J. Super. 244, 247 (App. Div. 1969)).

Further, "a basis for an accidental disability pension would exist if it were shown that the disability directly resulted from the combined effect of a traumatic event and a pre[-]existing disease." Id. at 186-87 (quoting Cattani v. Bd. of Trs., Police & Firemen's Ret. Sys., 69 N.J. 578, 586 (1976)). Accordingly, "the traumatic event need not be the sole or exclusive cause of the disability" as it is sufficient that "the traumatic event is the . . . essential significant or substantial contributing cause of the disability." Id. at 187; see also Korelnia v. Bd. of Trs., Pub. Emps.' Ret. Sys., 83 N.J. 163, 170 (1980). However, "the Legislature's change of the term 'result' to 'direct result' was 'intended to impose a stringent test of medical causation and . . . that the trauma . . . must at the very least be the essential significant or the substantial contributing cause of the disability.'" Kasper v. Bd. of Trs., Tchrs.' Pension & Annuity Fund, 164 N.J. 564, 577 (2000) (omissions in original) (quoting Korelnia, 83 N.J. at 170).

New Jersey courts have evaluated this causal requirement with varied, fact-sensitive determinations. See, e.g., Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 193 (2007) (petitioner qualified for accidental

disability because there was sufficient "direct" causation when "an inmate violently resisted being handcuffed" which resulted in the inmate "knocking [petitioner] backward" and him completely tearing a ligament in his wrist); Gerba, 83 N.J. at 176, 189 (petitioner did not qualify for accidental disability benefits after a fall at work because he had a prior back injury and the new trauma only "contributed to the progression of that condition presumably by aggravation"); Quigley v. Bd. of Trs., Pub. Emps.' Ret. Sys., 231 N.J. Super. 211, 221-24 (App. Div. 1989) (petitioner did not qualify for accidental disability benefits after getting rear-ended by a truck a year after a fall at work because the petitioner's "disability was not the 'direct result'" of his earlier fall); Petrucelli, 211 N.J. Super. at 289 (petitioner qualified for accidental disability after he fell at work because "the 'direct result' test was legally satisfied" as petitioner had "no prior back problems of any kind" even though petitioner had a "structural anomaly" in his back); Pushko v. Bd. of Trs., Tchrs.' Pension & Annuity Fund, 202 N.J. Super. 98, 99-101 (App. Div. 1985) (finding sufficient causation between a petitioner's total disability, which was psychiatric in nature, from his employment as a teacher and violent incidents involving students attacking him).

Against this backdrop and in these circumstances, we discern no basis to disturb the Board's determination. The Board reviewed and adopted the ALJ's findings, which were sufficiently grounded in the record. It was undisputed petitioner's prior shoulder injury remained symptomatic in the years leading up to the November 2020 incident. Petitioner's continued reports of pain were well-documented. Dr. Lakin, with sound credentials and experience, evaluated petitioner and his medical history, finding he "had a severe shoulder pathology that wasn't repaired in the beginning that was just . . . debrided." The expert observed petitioner's 2020 injury consisted of some arthritic conditions which "develop[ed] over a long period of time." Although petitioner's MRIs from 2017 and 2019 showed no labral tear, Dr. Lakin explained MRIs can "miss a lot of SLAP lesions," and the "best way to see" a SLAP tear, like petitioner's, is "intraoperatively." Critically, Dr. Lakin concluded petitioner's unrepaired prior injury largely caused his total disability, and the ALJ and the Board found that opinion persuasive.

Here, the ALJ observed and heard the testimony of both experts and reviewed petitioner's prior medical history. The ALJ found Dr. Lakin's testimony more credible than Dr. Weiss's and supported that conclusion with reference to the record. Although petitioner contends his expert's causation

21

opinion should have outweighed Dr. Lakin's, we will not supplant our judgment for that of the Board or the ALJ who painstakingly reviewed the testimony and evidence and supported the factual and credibility findings with detailed reasoning and citations to the record.  See H.K. v. State, 184 N.J. 367, 384 (2005) (recognizing we will not "disturb th[e] credibility determination[s]" of the ALJ "made after due consideration of the witnesses' testimony and demeanor during the hearing").  The experts, both qualified in the field of orthopedic medicine, diverged in their assessment of the severity of petitioner's prior shoulder injuries and the extent of its lasting impact.  This conflict in opinion does not persuade us the ALJ or the Board erred in accepting one over the other.

We are satisfied the Board did not err in finding the 2020 incident was not the direct essential significant or substantial cause of petitioner's total disability.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hawley

Clerk of the Appellate Division

22