WILLIAM KORELNIA, RESPONDENT, v. BOARD OF TRUSTEES
OF THE PUBLIC EMPLOYEES' RETIREMENT
SYSTEM, APPELLANT.

Argued November 14, 1979—Decided June 12, 1980.

*Erminie L. Conley,* Assistant Attorney General, argued the cause for appellant (*John J. Degnan,* Attorney General of New Jersey, attorney; *Stacy L. Moore, Jr.,* Deputy Attorney General, on the brief).

*Kenneth J. Doukas, Jr.,* argued the cause for respondent (*Hoagland, Longo, Oropollo & Moran,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

This appeal presents the same question which was determined this day in the case of *Gerba v. Board of Trustees of the Public Employees' Retirement System,* 83 *N.J.* 174 (1980). At issue is the entitlement of a public employee to an accidental disability retirement pension pursuant to *N.J.S.A.* 43:15A–43 under the Public Employees' Retirement System (PERS), *N.J.S.A.*

43:15A–1 *et seq.* In the *Gerba* decision we resolved such a question in the context of a claim that a physical disability was attributable to both an employment-related traumatic event and an underlying physical disease. The same circumstances are present in this case. Consequently, resolution of this appeal is governed by our decision in *Gerba v. Board of Trustees, PERS, supra.*

I

Appellant-respondent William Korelnia ("respondent" or "Korelnia") was enrolled in the Public Employees' Retirement System (PERS), effective May 1, 1959, while employed as a toll collector for the New Brunswick Parking Authority. He later became a safety inspector for the New Jersey Highway Authority, inspecting and replacing as necessary fire extinguishers and oxygen tanks at the various plazas and restaurants along the Garden State Parkway. Replacing empty or nearly empty fire extinguishers and oxygen tanks entailed lifting and carrying them manually to his station wagon, transporting them to the vendor, lifting and removing them from the station wagon upon arrival at the vendor, lifting them back into the station wagon after being refilled or recharged, transporting them back to the plazas or restaurants from which they had been removed, and then lifting them again from the station wagon and replacing them in their proper locations. The fire extinguishers (and presumably the oxygen tanks as well) weighed approximately between 17.5 and 75 pounds each and were of various dimensions. Thus, considerable lifting and bending were involved in Korelnia's job as safety inspector. Another function of respondent's job as safety inspector was to oversee the work performance of other employees in each of the five "districts" along the parkway where maintenance machinery was located.

While performing his duties as safety inspector on August 18, 1976, respondent suffered a back injury which is the subject of the claim herein. But prior thereto, on June 1, 1972, he had also suffered an injury to "[t]he same section of [his] spine." For this earlier back condition respondent in 1972 had received

periodic injections of muscle relaxant for approximately two months; he received no further back treatment after the discontinuation of these injections up until the August 18, 1976 injury. Respondent described the condition of his lower back during this four-year interim (1972–1976) as "stay[ing] the same," and as not hampering his work performance (including the lifting of the fire extinguishers and oxygen tanks). As for other unrelated maladies, respondent had suffered a heart attack in 1960 and had had a gall bladder operation in 1974. He had also missed a good deal of work time in 1976 prior to the back injury because of influenza (three weeks) and viral pneumonia (six weeks).

As noted, the injury on which respondent's disability pension claim was based occurred on August 18, 1976. He had transported several carbon dioxide fire extinguishers to the vendor, Kemp Fire Extinguisher Company of Paterson, for recharging. In lifting the last of the recharged extinguishers back into the station wagon, respondent slipped and dropped the approximately forty-pound cylinder. In the words of Korelnia, "I was loading [the extinguisher] onto the station [wagon] and I slipped, I jumped back away from the extinguisher not to get hit and I smacked my spine [lumbosacral area] on the tailgate of the station wagon."

Respondent, in pain, remained stationary either seated in or on the car for "awhile" (estimated by respondent to be fifteen to twenty minutes) after which time he picked up the dropped extinguisher, placed it in the station wagon, and returned to his home office. The impact of respondent's back with the station wagon did not cause bleeding or a breaking of the skin and respondent did not seek immediate medical attention or treatment. Back at his home base Korelnia reported the incident to his supervisor who advised him to "wait and see" with respect to medical treatment. Respondent worked the next day, August 19, including a round-trip drive to Cape May in excess of 240 miles.

Korelnia, still in considerable pain by his own recounting, after reporting to work the next morning consulted (by appointment obtained for him by his superior) Dr. William C. Wilentz,

"the company doctor." Respondent has never returned to work since this visit to Dr. Wilentz on August 20, 1976. After examining respondent on that date and advising him not to return to work, Dr. Wilentz administered diathermy treatment, "strapped" respondent up, and wrote a prescription for pain-killing medication. Respondent was not then hospitalized, nor has he ever been hospitalized since, as a result of this particular incident. Respondent received such treatment from Dr. Wilentz on a twice-weekly basis through November 12, 1976.

On December 1, 1976, Korelnia filed with PERS an Application for (Accidental) Disability Retirement in accordance with *N.J.A.C.* 17:2–6.1. In connection with this application he was examined by Dr. Joseph P. Zawadsky on December 15, 1976 and again on January 19, 1977. These were merely diagnostic examinations; no treatment was either recommended or begun. In a letter dated May 4, 1977, reporting the results of these two examinations, Dr. Zawadsky noted that respondent "continued to have back dysfunction." Dr. Wilentz also issued a letter report, dated May 9, 1977, in connection with the pension application in which letter he reported that respondent had "suffered a contusion of his lumber [sic] region which was superimposed on a [sic] old marked hypertrophic changes [sic] of 3rd and 4th lumbar vertebrae (X-rays)." Dr. Wilentz, in his earlier letter report of October 20, 1976, had also there made reference to respondent's prior injury or condition, noting that respondent had "an unstable back superimposed on an underlying pathology of his spine which was aggravated by this [1976] incident." The third medical opinion introduced in this case is that of Dr. Paul E. Van Horn on behalf of the Division of Pensions. Dr. Van Horn, in a letter report dated February 24, 1977, stated, after having examined respondent on February 16, 1977, that Korelnia "had an underlying degenerative osteoarthritis of the lumbar spine which became symptomatic and disabling by way of the injury related above," or, more briefly, "[d]egenerative lumbar arthritis, symptomatic by way of the injury."

The Medical Review Board of the Division of Pensions through Dr. William H. Coleman, found Korelnia to be "totally incapacitated," with such incapacity having a causal relationship with the "alleged traumatic incident." The PERS Board of Trustees, however, denied Korelnia's application for accidental disability retirement benefits. The Board, having found respondent permanently and totally disabled for the performance of his duties as safety inspector, approved instead, as provided for in *N.J.A.C.* 17:2–6.7, "[o]rdinary [d]isability retirement [benefits pursuant to *N.J.S.A.* 43:15A–42] on maximum allowance without option, effective January 1, 1977." The Board of Trustees, in so deciding, found that (1) respondent had failed to show permanent and total disability as a direct result of a traumatic event occurring during the performance of his regular work duties, and (2) the August 18, 1976 incident was not a "traumatic event" as statutorily defined and interpreted.

Respondent Korelnia, desiring to receive the higher accidental disability retirement benefits rather than the ordinary disability retirement benefits, challenged the findings of the Board of Trustees and requested an appeal. After a formal hearing, at which respondent was the only witness, the hearing officer for the Division of Pensions issued his report recommending affirmation of the Board's determination. Respondent submitted several exceptions to the hearing officer's report and recommendation. The Board of Trustees considered Korelnia's appeal and unanimously affirmed the initial denial of accidental disability retirement benefits (leaving untouched, of course, the award of ordinary disability retirement benefits).

On appeal to the Appellate Division, that court, by an unreported opinion, reversed the determination of the PERS Board of Trustees and remanded the matter to the Board with direction that an accidental disability retirement allowance be awarded. Relying on *Cattani v. Board of Trustees, Police & Firemen's Retirement System*, 69 *N.J.* 578 (1976), the Court held that Korelnia's August 18, 1976 incident was indeed a "traumatic event" within the meaning of the statute. The court further held that Korelnia's "disability 'directly resulted from the com-

bined effect of [that] traumatic event and a preexisting disease,' *Cattani, supra, viz.*, his 'underlying degenerative osteoarthritis of the lumbar spine.'" The PERS Board of Trustees subsequently filed a petition for certification which was granted on May 30, 1979. 81 *N.J.* 272 (1979).

## II

The Appellate Division, in reversing the determination of the PERS Board of Trustees, relied upon our decision in *Cattani, supra*. The court below was apparently satisfied that Korelnia's disability was the "direct result" of the "combined effect" of a traumatic event, the slip and fall against the automobile tailgate on August 18, 1976, and a preexisting disease consisting of an "underlying degenerative osteoarthritis of the lumbar spine." We agree with the court that Korelnia's fall in August 1976 constituted a traumatic event. However, its conclusion failed, understandably, to consider and apply the principles which must govern accidental disabilities involving the combined effects of a traumatic event and an underlying preexisting disease, as explained in today's decision in *Gerba v. Board of Trustees, PERS, supra*. Accordingly, the decision below is reversed. Because, however, our review of the evidence in this case reveals an extremely close factual issue on the question of medical causation and the interrelationship of the combined etiology of the traumatic event and underlying disease, we deem it appropriate that this case be remanded to the PERS Board of Trustees for a reconsideration of respondent's claim in light of our *Gerba* decision.

It was recognized in *Gerba* that an accidental disability may occur under *N.J.S.A.* 43:15A–43 even though it was caused in some measure by both a traumatic event and an underlying disease. 83 *N.J.* at 185–186. The statutory standards for an accidental disability are two-fold. They require that the disability be the "direct result" of a traumatic event. They also require that the disability *not* be the result of a "cardiovascular, pulmonary or musculoskeletal condition which was not a direct result of a traumatic event." *N.J.S.A.* 43:15A–43. While the

statutory definition stresses that the resulting disability must be "direct" in terms of its traumatic origins, it does not require that the antecedent trauma be the exclusive or sole cause of the disability. *Gerba v. Board of Trustees, PERS, supra,* 83 *N.J.* at 186–187. We also pointed out that when the disability was due to a cardiovascular, pulmonary or musculo-skeletal condition which was not a direct result of a traumatic event, but which event may have simply aggravated that condition, the claimant would not be entitled to an accidental disability pension. 83 *N.J.* at 185–186.

■ As recognized in our earlier *Cattani* decision, an accidental disability may under certain circumstances involve a combination of both traumatic and pathological origins. *Cattani v. Board of Trustees, PERS, supra,* 69 *N.J.* at 586. While the medical etiology of an employee's statutory accidental disability can combine both traumatic and organic sources, it is clear that the Legislature, by requiring that such disability constitute the "direct result" of a traumatic event, intended to impose a stringent test of medical causation and, to that end, that the trauma, while it need not be the sole or exclusive causative agent, must at the very least be the essential significant or the substantial contributing cause of the disability. *Gerba v. Board of Trustees, PERS, supra,* 83 *N.J.* at 186. This general statutory objective was recognized in *Cattani v. Board of Trustees, PFRS, supra,* 69 *N.J.* at 586. See also *In re Iannelli,* 157 *N.J.Super.* 324, 335 (App.Div.1978), certif. den. 77 *N.J.* 488 (1978); *Titman v. Board of Trustees, TPAF,* 107 *N.J.Super.* 244, 246–247 (App.Div. 1969). Accordingly, in *Gerba,* we held specifically that under *N.J.S.A.* 43:15A–43, where a disability involved the combined effect of both a traumatic event and an underlying disease, the traumatic source must constitute "the essential significant or the substantial contributing cause of the resultant disability." 83 *N.J.* at 186.

### III

■ It does not appear in this case that either the court below or the administrative agency applied these standards in

resolving respondent's claim for accidental disability benefits. However, on one issue in the case, namely, whether respondent was involved in a "traumatic event," we concur in the opinion of the court below that the incident of August 18, 1976 was such a traumatic event. See *Gerba v. Board of Trustees, PERS, supra,* 83 *N.J.* at 188. The Appellate Division correctly reversed the contrary finding of the pension board on this issue. Nevertheless, with respect to the other important issue in the case, *viz,* whether the traumatic event directly resulted in the disability, there must, in our opinion, be a reversal and a remand for redetermination of respondent's accidental disability claim.

By way of instructive contrast to this case, the record in *Gerba* required a reversal and reinstatement of the determination of the pension board that there was no direct causal connection between the traumatic events and the resultant disability. In *Gerba,* even under the more relaxed standards for accidental disability there applied by the Appellate Division, the facts did not demonstrate the requisite degree of medical causation between the claimant's disability and the antecedent traumatic events; the medical evidence disclosed no meaningful causal connection (let alone a "direct" connection, *i. e.,* an essential significant or substantial contributing cause) between the disability and the earlier traumas. Hence, we concluded that the determination of the pension board denying the accidental disability claim was supported by sufficient credible evidence found in the record, which required affirmance on judicial review. *Id.* at 188–189.

Here, the medical evidence (*ante* at 166–168) is not as clear as to whether respondent's disability would qualify as an accidental disability within the meaning of *N.J.S.A.* 43:15A–43, using the standards which we have endeavored to explain. It is unclear whether the medical evidence shows that respondent's disability, though attributable in some degree to the "underlying pathology of his spine," nevertheless resulted directly from the traumatic injury suffered by respondent on August 18, 1976 in the sense that that trauma constituted either the essential significant or the substantial contributing cause of the ultimate dis-

ability; or, alternatively, whether the traumatic event only ignited or aggravated an underlying osteoarthritic condition without constituting a medically sufficient cause thereof. Fairness dictates a remand to afford respondent the opportunity to present evidence on these issues before the pension board.

Accordingly, the judgment of the Appellate Division is reversed and the matter remanded to the Board of Trustees of the Public Employees' Retirement System for proceedings in accordance with this opinion.

PASHMAN, J., dissenting.

By applying an unnecessarily restrictive interpretation of the term "direct result" in *N.J.S.A.* 43:15A–43—adopted today in *Gerba v. Board of Trustees, PERS*, 83 *N.J.* 174 (1980)—the Court has placed an exceedingly difficult—if not impossible—burden on the claimant to show medical causation on remand. Under a proper interpretation of the statutory term, claimant's application is clearly warranted, for there is ample evidence of direct causation in the record. Since a remand is unnecessary, I respectfully dissent.

Under the governing statute, an accidental disability pension would be warranted "if it were shown that the disability directly resulted from the combined effect of a traumatic event and a preexisting disease." *Cattani v. Board of Trustees, Police & Firemen's Retirement System*, 69 *N.J.* 578, 586 (1978). I continue to believe that the aggravation of a preexisting condition, directly caused by a traumatic event, can satisfy the statutory standard if the accident triggered what had previously been a relatively latent condition. *Gerba*, 83 *N.J.* at 197–198 (Pashman, J., dissenting). "The mere fact that claimant ultimately might have suffered from this condition in the distant future cannot detract from its sudden manifestation after [the traumatic event]." *Cattani*, 69 *N.J.* at 596 (Pashman, J., dissenting).

The majority in the present case remands because it finds that the evidence is "unclear" whether the trauma constituted the

direct cause of the disability. *Ante* at 171–172. It bases this conclusion on its view that the term "direct result" in *N.J.S.A.* 43:15A–43 requires that the trauma be the "essential significant or the substantial contributing cause of the ultimate disability." *Ante* at 171–172. I do not claim to understand the meaning of this phrase. Judging from the majority's application of it, this novel standard imposes too heavy a burden on disabled public employees.

Under the proper interpretation of the statute, a remand is unnecessary. A brief review of the evidence clearly shows a definite causal relationship between the trauma and the disability. The report of Dr. William C. Wilentz, a physician employed by the New Jersey Highway Authority, stated that Korelnia suffered from an "unstable back superimposed on an underlying pathology of his spine which was aggravated by [the traumatic event.]" Dr. Paul E. Van Horn, on behalf of the Division of Pensions, stated in his report that claimant "had an underlying degenerative osteoarthritis of the lumbar spine which became symptomatic and disabling by way of the [traumatic event]." Finally Dr. William H. Coleman's report, also prepared for the Division of Pensions, stated that "[f]rom a medical standpoint there does appear to be a causal relationship between the disability and the alleged traumatic incident."

The medical proofs above clearly demonstrate that Korelnia's disability "directly resulted from the combined effect of a traumatic event and a preexisting disease." *Cattani*, 69 *N.J.* at 586. As in *Gerba*, the evidence shows that the traumatic event ignited what had previously been a relatively dormant condition. *Gerba*, 83 *N.J.* at 196–197 (Pashman, J., dissenting). This is not a case where the disability "would have occurred when it did irrespective of the traumatic event." *In re Sigafoos*, 143 *N.J. Super.* 469; 473 (App.Div.1976), certif. den., 72 *N.J.* 458 (1976).

The Appellate Division reversed the Board of Trustees' denial of Korelnia's application for accidental disability retirement benefits under *N.J.S.A.* 43:15A–43. For the foregoing reasons and those expressed in my dissenting opinion in *Gerba*, I would affirm that judgment.

*For reversal and remandment*—Justices SULLIVAN, CLIF-
FORD, SCHREIBER, HANDLER and POLLOCK—5.

*For affirmance*—Justice PASHMAN—1.