**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2606-21

KEYANA SMITH,

      Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
POLICE AND FIREMEN'S
RETIREMENT SYSTEM,

      Respondent-Respondent.

_____

Argued December 5, 2023 – Decided December 18, 2023

Before Judges Mayer and Paganelli.

On appeal from the Board of Trustees of the Police and Firemen's Retirement System, Department of the Treasury, PFRS No. xx6330.

Samuel Michael Gaylord argued the cause for appellant (Szaferman, Lakind, Blumstein & Blader, PC, attorneys; Samuel Michael Gaylord, on the brief).

Juliana C. DeAngelis, Legal Counsel, argued the cause for respondent (Nels J. Lauritzen, Deputy Director of Legal Affairs, attorney; Juliana C. DeAngelis, on the brief).

PER CURIAM

Petitioner Keyana Smith (Smith) appeals from a March 16, 2022 final agency decision by respondent Board of Trustees (Board) of the Police and Firemen's Retirement System (PFRS) denying her application for accidental disability retirement benefits. We affirm.

We recite the facts from the testimony adduced at the hearings before an administrative law judge (ALJ). In 2012 or 2013, Smith began working as a police officer with the Camden County Police Department (CCPD). On September 13, 2016, Smith and another officer were dispatched to a residence where a woman reported her son was having a seizure. An emergency medical technician (EMT) also responded to the scene. Upon the officers' arrival, a large man stood in the doorway of the home and yelled obscenities when the EMT asked the man to close the door. A physical altercation followed.

The officers and the EMT attempted to restrain the man. The other officer and the EMT restrained the upper portion of the man's body, while Smith "bear hugged" the lower portion of the man's body. Smith, applying her body weight, attempted to pin the man's legs to the ground. The man "jolted about" while all three responding personnel restrained him.

2

Smith purportedly injured herself while restraining the man. However, Smith did not report suffering an injury immediately.

Upon transporting the man to the hospital, Smith realized she could not lift her right arm. Smith went to the emergency room at a different hospital and complained of pain in her right shoulder. The hospital took an x-ray but the image revealed no evidence of any abnormality in Smith's shoulder. The hospital discharged Smith after completing an evaluation. Thereafter, Smith returned to the police station to file an incident report and an injury report.

After the incident, Smith started treating for shoulder pain with Dr. Larry Rosenberg.[1] Dr. Rosenberg recommended Smith undergo magnetic resonance imaging (MRI) of the right shoulder. A December 2, 2016 MRI revealed "[s]hallow, partial-thickness, bursal surface tearing along the right supraspinatus tendon insertion." Smith returned to light duty work at the CCPD on January 25, 2017.

On February 20, 2017, Smith began treating with Dr. Michael Sidor. Dr. Sidor sent her for physical therapy and another MRI of the right shoulder.

---

[1] Smith received all medical treatment through workers' compensation.

A-2606-21

On May 24, 2017, Dr. Sidor performed "[r]ight shoulder arthroscopic limited debridement of partial-thickness low-grade supraspinatus tendon tears." The post-operative report indicated "normal" findings in Smith's right shoulder except for the "subacromial space." In the subacromial space, Dr. Sidor reported "low-grade partial-thickness tears" of about twenty percent, which he "debrided with a shaver."

After this procedure, Smith underwent several rounds of physical therapy. The physical therapist reported Smith's range of motion and functional ability improved but her progress was slower than expected. The physical therapist recommended home exercises for Smith.

Because Smith reported shoulder pain six months after the arthroscopic procedure, Dr. Sidor sent Smith for a functional capacity examination (FCE). The FCE report stated Smith "demonstrated mild sub-maximum effort" and the results were "compatible with . . . symptom magnification." Accordingly, the FCE report recommended Smith return to "[l]ight-[m]edium" work at the CCPD, which included "occasional lift[ing] . . . up to [thirty-five pounds]," "administrative duties, occupational driving, directing traffic . . . , interviewing [individuals] . . . , assisting with light first aid, [and] conducting investigations." Due to Smith's upper right extremity strength performance during the exam, the

FCE report recommended Smith not be involved in "altercations or restraining unruly individuals" until she improved her upper body strength through the home exercises recommended by the physical therapist.

After reviewing the results of the FCE, Dr. Sidor advised Smith she had reached maximum medical improvement and discharged her from his care. Based on the FCE, Dr. Sidor believed Smith could not return to work as a police officer because her job duties included restraining of suspects weighing two hundred pounds or more.

On April 9, 2018, Smith applied for accidental disability retirement benefits. In her application, Smith stated she "sustained injuries to [her] neck[,] lower back[,] left shoulder and right shoulder which included right rotator cuff surgery" and the injuries "prevent[ed her] from returning to [her] job as a police officer as [she] would not be able to restrain suspects[,] perform arrests or qualify with a shotgun." As a result of the injuries allegedly suffered on September 13, 2016, Smith claimed to be totally and permanently disabled.

The Board denied Smith's application for accidental disability retirement benefits. It concluded Smith did not sustain a total and permanent injury. Moreover, the Board determined any injury Smith allegedly suffered was not a direct result of the incident on September 13, 2016.

5

Smith appealed and the matter was transmitted to the Office of Administrative Law as a contested case. An administrative law judge (ALJ) was assigned to the matter and scheduled hearings. The ALJ held hearings over two non-consecutive days.

After reviewing the testimony and documentary evidence, the ALJ issued a February 17, 2022 written decision. In a detailed thirty-five-page initial decision, the ALJ determined Smith failed to present "enough credible information . . . in the testimony to support the contention that [she was] totally and permanently disabled from performing the duties of a police officer." The ALJ further found Smith failed to demonstrate her claimed injuries were the direct result of the September 13, 2016 incident. Thus, the ALJ concluded "the Board's denial of accidental disability retirement [benefits] . . . was appropriate."

Smith filed exceptions with the Board. On March 16, 2022, after reviewing the exhibits presented to the ALJ, the ALJ's initial decision, and Smith's exceptions to the ALJ's decision, the Board affirmed the denial of Smith's application for accidental disability retirement benefits. Smith then appealed to this court.

We briefly summarize the testimony presented to the ALJ. Smith relied on her own testimony and the expert medical testimony of Dr. Sidor. The Board

relied on the expert medical testimony of Dr. Jeffrey Lakin, an orthopedic surgeon.

Dr. Sidor testified at length regarding his treatment of Smith. Dr. Sidor explained a third of his patients continued to experience pain after arthroscopic shoulder surgery similar to the pain reported by Smith. He further opined police officers required a perfect shoulder to perform their duties and it would be difficult to return police officers to full-duty status due to the "gun issue" and "fighting issue." However, Dr. Sidor conceded he did not review Smith's job description with the CCPD and "did not confirm whether a completely normal shoulder was needed to return to work." Dr. Sidor testified Smith could not return to work based upon his own knowledge of "what police officers do," and knowledge obtained from other police officers.

At the Board's request, Dr. Lakin conducted an independent medical examination of Smith in June 2018. In addition to his physical examination, Dr. Lakin reviewed Smith's medical records, the MRIs, and the job description for Smith's work as a CCPD police officer.

During his examination, Dr. Lakin found Smith had "excellent" strength and range of motion in her upper body and no signs of instability in the right shoulder. Dr. Lakin testified Smith suffered a shoulder sprain or shoulder

contusion as a result of the September 2016 incident, which resolved as of the date of his examination. In reviewing Dr. Sidor's operative report, Dr. Lakin stated the findings in the report indicated nothing significant regarding Smith's shoulder. Nor could Dr. Lakin causally connect any of the findings in that operative report to the September 2016 incident.

Additionally, Dr. Lakin testified "partial tears" in the shoulder tendon of fifty percent or less[2] were "pretty insignificant" and there was "no way to tell if the[] tears were related to the trauma or related to aging." He further explained partial tears of the shoulder tendon "are most[ly] asymptomatic," and that would explain why Smith had no prior shoulder complaints. Additionally, Dr. Lakin stated the tears were "highly unlikely" to have been caused by the September 2016 incident because Smith did not receive a direct traumatic "high-velocity injury" to her right shoulder.

Based on his physical examination and review of Smith's medical records and job description, Dr. Lakin concluded Smith was not totally and permanently disabled from the normal duties of her job as a police officer. He further testified

---

[2] In Smith's case, Dr. Lakin referred to Dr. Sidor's reported finding of partial tears of about twenty percent in Smith's right shoulder.

Smith suffered no total and permanent disability "[for] any reason, including the accident."

In her written decision, the ALJ rendered credibility determinations based on her ability to see and hear the testifying witnesses. Regarding Smith's testimony, the ALJ found "[i]t did not clearly align with the medical documentation," stating Smith "would complain about an area of pain on her body, and when the treating provider indicated there was nothing objective to support a disabling condition, [Smith] would return with complaints of pain regarding other areas of the body." Further, the ALJ explained "[t]he records support the proposition that there was symptom magnification throughout [Smith's] treatment." Additionally, the ALJ noted "[t]here was nothing in the record to support that there was a significant trauma to [Smith's] right shoulder, such as having received a direct blow or fall." Thus, the ALJ found Smith's testimony "was not persuasive to support her assertions of a permanent disability under the conditions and totality of the circumstances."

Regarding the expert medical testimony, the ALJ noted the doctors had "conflicting opinions." In reviewing Dr. Sidor's testimony, the ALJ found "[h]is opinion that Smith sustained the injury during the incident was not strongly set forth" and he "did not emphatically explain or tie together that the partial tears

9

were a direct result of the struggle with the suspect as described by Smith." Thus, the ALJ found Dr. Sidor proffered only a "hypothetical assertion that Smith's debilitation injury was incurred during the incident, and that the same has persisted, to cause a total and permanent disability."

On the other hand, the ALJ found Dr. Lakin "efficiently" and "vigorously defend[ed] his opinions." The ALJ further noted Dr. Lakin relied on observations he made throughout his career as an orthopedic surgeon, and Smith's medical records in opining her "condition was due to aging, or at least it was of such insignificance that it could not have been caused by the incident as described." According to the ALJ, Dr. Lakin relied on the same foundational evidence in support of his opinion "that Smith was not permanently and totally disabled from the performance of her duties as a police officer."

While recognizing that greater weight is usually afforded to opinions proffered by a treating doctor, such as Dr. Sidor, when compared to opinions rendered by a one-time independent medical examiner, such as Dr. Lakin, the ALJ noted the principle was "not an unyielding measure." The ALJ found Dr. Sidor's reports "reflect[ed] quizzical inquiry as to why Smith's complaints of pain persisted and that she had not shown greater improvement with multiple rounds of physical therapy." The ALJ noted records from Smith's other medical

providers "had similar remarks and even questioned that there was symptom magnification." The ALJ explained the record presented "subjective complaints of pain and a minimal range of motion deficit, to demonstrate that the debridement of the partial tears was unsuccessful, or that there was some injury from the incident that was so debilitating." Thus, the ALJ accorded "greater reliance and credibility to the opinions expressed by Dr. Lakin, which [we]re most supported by the totality of the evidence."

Applying the well-settled case law governing entitlement to accidental disability retirement benefits, the ALJ explained the sole issue was "whether the incident caused the disabling injury, and that it was not the result of a pre-existing disease or condition." In resolving that issue, the ALJ noted Smith was asymptomatic and denied any pre-existing trauma to her shoulder. However, the ALJ explained the evidence supported the conclusion that Smith "strained and sprain[ed] the musculature of the shoulder in the incident" and there was "no pre-incident MRI imaging" to determine if the partial tears in Smith's shoulder predated the September 13, 2016 incident. Based on the evidence, the ALJ accepted as more persuasive the opinion of Dr. Lakin that partial tears in the shoulder "are generally part of the aging process, which can begin when an individual is in their twenties." She further accepted Dr. Lakin's explanation

that "[t]he mechanics of the incident, with a bear hug being done by Smith to restrain the suspect, would not be the type of incident to cause the small partial tears."

The ALJ then considered whether Smith "suffer[ed] from a total and permanent disability, rendering her unable to perform the duties of a police officer." The ALJ found "no evidence [Smith] attempted to qualify" for her firearm certification after the incident. The ALJ further noted "there [was] no objective testing to demonstrate that she has such deficits."

The ALJ rejected Dr. Sidor's opinion that Smith was unable to perform the job of a police officer because his opinion was premised on his personal "belief that a police officer must have a 'completely normal' shoulder." The ALJ explained "[t]here is nothing so asserted in the job description" for a CCPD officer. She also noted there was no "evidence to support that complaints of pain and minimal range of motion deficit . . . preclude[d] someone from being a police officer."

Based on the evidence and testimony, the ALJ concluded "[t]here was not enough credible information provided in the testimony to support the contention that Smith is totally and permanently disabled from performing the duties of a

police officer." Thus, the ALJ determined the Board's denial of Smith's application for accidental disability retirement benefits was appropriate.

On appeal, Smith argues she is totally and permanently disabled from the performance of her regular and assigned duties as a CCPD police officer. She further argues her disability was a direct result of the September 2016 incident. Thus, Smith contends she is entitled to an award of accident disability retirement benefits. We disagree.

Our review of an agency decision is limited. In re Herrmann, 192 N.J. 19, 27 (2007). An administrative agency's final quasi-judicial decision "will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). The burden of proving a decision was arbitrary, capricious, or unreasonable is on the party challenging the agency's action. Lavezzi v. State, 219 N.J. 163, 171 (2014).

When reviewing whether an agency decision is arbitrary, capricious, or unreasonable, we consider: (1) whether the agency action violated "express or implied legislative policies"; (2) whether there was substantial evidence in the record to support the agency's decision; and (3) whether in applying the law to

the facts, the agency reached a conclusion "that could not reasonably have been made on a showing of the relevant factors." Allstars Auto. Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)). If the agency satisfies these requirements, we "owe[] substantial deference to the agency's expertise and superior knowledge of a particular field." Herrmann, 192 N.J. at 28.

A PFRS member may seek accidental disability retirement benefits under N.J.S.A. 43:16A-7(1). The statute provides:

> Upon the written application by a member in service, by one acting in his behalf or by his employer any member may be retired on an accidental disability retirement allowance; provided, that the medical board, after a medical examination of such member, shall certify that the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.

Under the statute, the member must prove permanent and total disability to qualify for accidental disability retirement benefits. Thus, the ALJ appropriately focused her decision on whether Smith was totally and permanently disabled.

14

In rendering a decision on this issue, the ALJ relied extensively on the medical experts' testimony.

"The choice of accepting or rejecting testimony of witnesses rests with the administrative agency, and where such choice is reasonably made, it is conclusive on appeal." Oceanside Charter Sch. v. N.J. State Dep't of Educ., 418 N.J. Super. 1, 9 (App. Div. 2011) (quoting In re Application of Howard Sav. Bank, 143 N.J. Super. 1, 9 (App. Div. 1976)). As the factfinder, the ALJ has "the prerogative to evaluate the credibility of the testimony of the competing experts" and to find one expert's testimony more credible than another expert's testimony. N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 258 (App. Div. 2019); see also City of Long Branch v. Liu, 203 N.J. 464, 491 (2010). Deference is "especially appropriate when the evidence is largely testimonial and involves questions of credibility." In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997).

Here, the ALJ had to determine which expert's opinion was more credible based on the evidence in the record. The ALJ thoroughly summarized the medical testimony proffered by Drs. Sidor and Lakin. She painstakingly explained why Dr. Lakin's testimony, despite not being Smith's treating doctor, was more persuasive and credible. It was based on Dr. Lakin's credible

testimony that the ALJ concluded Smith failed to prove she was totally and permanently disabled. We are satisfied there was more than sufficient credible evidence in the record for the Board to adopt the ALJ's initial decision concluding Smith failed to satisfy her burden of proving she suffered a total and permanent disability.

Even if we agreed Smith satisfied her burden of proving she suffered a total and permanent disability, which we do not, Smith was still required to prove the other prongs necessary to obtain accidental disability retirement benefits, including a direct causal connection between the incident and her disability.

To establish entitlement to accidental disability retirement benefits, a member must prove:

> 1. that he is permanently and totally disabled;
>
> 2. as a direct result of a traumatic event that is
>
> > a. identifiable as to time and place,
> >
> > b. undesigned and unexpected, and
> >
> > c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
>
> 3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;

4. that the disability was not the result of the member's willful negligence; and

5. that the member is mentally or physically incapacitated from performing his usual or any other duty.

[Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys. 192 N.J. 189, 212-13 (2007).]

As the Court explained in Richardson, "[t]he polestar of the inquiry is whether, during the regular performance of [a member's] job, an unexpected happening, not the result of pre-existing disease alone or in combination with the work, has occurred and directly resulted in the permanent and total disability of the member." Id. at 214. A member's satisfaction of the "direct result" prong is typically supported by expert medical opinions. See Korelnia v. Bd. of Trs., Pub. Emps.' Ret. Sys., 83 N.J. 163, 171 (1980). The member bears the burden of proving the "direct result" prong for entitlement to an award of accidental disability retirement benefits. See Gerba v. Bd. of Trs., Pub. Emps.' Ret. Sys., 83 N.J. 174, 185 (1980).

Here, the ALJ had to determine whether Smith's claimed disability was the direct result of the September 2016 incident. In support of her claimed total and permanent disability as a direct result of September 2016 incident, Smith proffered the testimony of her treating physician, Dr. Sidor. However, the ALJ

17

found Dr. Sidor failed to present credible evidence that Smith's shoulder injury was the direct result of the September 2016 incident. Rather, the ALJ relied on Dr. Lakin's objective review of the medical evidence and his credible testimony that the mechanics of incident, as described by Smith, lacked any evidence she suffered a total and permanent injury as a direct result of a powerful blow or similar forceful trauma to her shoulder during the September 2016 incident.

Having reviewed the record, we are satisfied the Board's adoption of the ALJ's decision that Smith failed to meet her burden to be entitled to accidental disability retirement benefits was based on substantial credible evidence in the record and was not arbitrary, capricious, or unreasonable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

18