**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0249-24

J.W.,[1]

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
POLICE AND FIREMEN'S
RETIREMENT SYSTEM,

     Respondent-Respondent.

_____

        Argued November 18, 2025 – Decided January 12, 2026

        Before Judges Firko and Perez Friscia.

        On appeal from the Board of Trustees of the Police and Firemen's Retirement System, Department of the Treasury, PFRS No. xx7632.

        Wayne Brown argued the cause for appellant (Alterman & Associates, LLC, attorneys; Stuart J. Alterman, of counsel and on the briefs).

---

[1] We use initials to preserve the confidentiality of these proceedings. R. 1:38-3(a)(2).

Thomas R. Hower argued the cause for respondent (Nels J. Lauritzen, Deputy Director of Legal Affairs, of counsel; Kimberly A. Sked, Staff Attorney, on the brief).

PER CURIAM

Petitioner J.W. appeals from the Board of Trustees (Board) of the Police and Firemen's Retirement System's August 14, 2024 final agency decision (FAD) denying his accidental disability retirement (ADR) benefits application pursuant to N.J.S.A. 43:16A-7(a)(1). Having reviewed the record, parties' arguments, and applicable law, we affirm.

I.

J.W. was a patrol officer with the Audubon Police Department (APD). He began working as a police officer in 2007 and transferred to work for the APD in May 2013. J.W. resided in Audubon with his wife and two children. J.W.'s brother, M.W., also resided in Audubon with his wife, C.W., and their two children. C.W.'s father, K.V., and mother, J.V., lived near J.W.'s residence and maintained a close relationship.

On January 11, 2021, while working at the APD, J.W. received a phone call from his brother, advising that K.V. had shot and killed J.V. and then committed suicide (first incident). J.W., along with his supervisor, C.G., responded to the residence, encountering C.W., who was crying, and her brother,

2

A-0249-24

E.V., outside. The siblings advised J.W. that their parents were deceased. J.W. went to the backyard and observed K.V. was "slumped over . . . with an apparent gunshot wound" that caused his head to be mostly "blown off." Approximately one month later, on February 8, 2021, a colleague officer, M.M., called the APD while J.W. was working. The officer requested assistance at his home for his daughter, but after J.W. arrived, the officer was not there and was later found to have committed suicide (second incident). J.W. did not return to work after the second incident.

On July 19, 2021, citing the first incident, J.W. filed an ADR benefits application under N.J.S.A. 43:16-7 with the Division of Pensions and Benefits. J.W. stated that he was disabled because he could "no longer . . . perform the required duties of a police officer" based on the first incident.

On April 11, 2022, the Board denied J.W.'s application for ADR benefits, finding he failed to satisfy all the factors under N.J.S.A. 43:16-7. The Board found that J.W. had established he was "totally and permanently disabled from the performance of [his] regular and assigned job duties" and was "physically or mentally incapacitated from the performance of [his] usual or other duties." Regarding whether J.W. had established the first incident was a traumatic event that caused his disability, the Board determined the event: was "identifiable as

A-0249-24

to time and place"; and was "undesigned and unexpected." The Board also determined the traumatic event "occurred during and as a result of [his] regular or assigned duties" and was "not a result of [his] willful negligence." The Board, however, further found J.W. had failed to prove that: the "reported disability [wa]s . . . the direct result of a traumatic event, as the event [wa]s not caused by an external circumstance"; his disability "result[ed] from [a] 'direct personal experience of a terrifying or horror inducing event that involved actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person'"; and the traumatic event "was objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury." The Board granted J.W. ordinary disability retirement benefits, effective as of December 1, 2021.

J.W. moved for reconsideration and, alternatively, requested that the Board accept an appeal of the decision and forward the matter to the Office of Administrative Law (OAL). J.W. noted the Board found each relevant ADR factor was established except that the disability was the "result of a traumatic event" that was a "'direct personal experience of a terrifying or horror inducing event that involved actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person'" and

4

"was objectively capable of causing . . . a disabling mental injury." On June 14, 2022, the Board approved J.W.'s hearing request and transferred the matter to the OAL as a contested case. The Board did not seek to challenge any factors it found J.W. had proven under N.J.S.A. 43:16A-7(a)(1) or J.W.'s request to appeal the "Board's denial" "based on two aspects only."

The Administrative Law Judge (ALJ) conducted a four-day hearing. Relevant to J.W.'s treatment and mental disability from the traumatic event, the parties admitted into evidence: J.W.'s medical records from Dr. Jennifer Kelly, his treating psychologist, and her authored reports; the APD reports; and the Board's expert Dr. Daniel LoPreto's authored reports. During the hearing, J.W., C.G., and the two experts testified.

Prior to hearing testimony, the ALJ addressed motions in limine and the disputed issues counsel presented. J.W.'s counsel argued the appeal stemmed from the Board's finding that J.W.'s alleged "disability [wa]s not the direct result of a traumatic event." J.W.'s counsel asserted there was agreement with the Board's counsel that the issue of "direct results" was "to the extent of whether it was horrific or not." The Board's counsel acknowledged that "causation[,] . . . being part of a definition of a traumatic event[,]" was at the heart of the case and "the reason [the parties] have the medical reports that [they] have."

A-0249-24

J.W. testified that on the day of the first incident, he was in the APD headquarters when he received a call from his brother who requested J.W. respond to C.W.'s parents' house. J.W. learned that C.W.'s parents, K.V. and J.V., were dead from a murder-suicide before he went to the residence. After arriving, J.W. went to the backyard where he observed K.V. was deceased, sitting on a bench with a self-inflicted gunshot head wound. He knew it was "hopeless" from the injuries observed and immediately recalled that, months earlier, he had spoken with K.V. about building the same bench. J.W. explained the families were very close and spent significant time together. He also learned J.V. was deceased inside the residence lying on a couch. J.W. did not enter the residence, and after remaining at the scene for approximately thirty minutes, he returned to the APD headquarters then went home. J.W. expressed how difficult it was to tell his wife, children, and mother. After observing a news helicopter over the residence, he called his brother to warn him of the media attention. Later that day, J.W. went to spend time with his brother and sister-in-law.

The next day, J.W. returned to the residence while working to remove the couch and clean up. Upon entering the residence, he realized it was too difficult to be there and broke down crying. After Department of Public Works' employees placed the couch J.V. was killed on in a trash truck and it was

A-0249-24

compressed, he became distressed after observing "all the blood . . . flying onto the street." J.W. expressed feeling a great responsibility to C.W. and his brother. The following day, he returned to the residence again, requested the trash truck, and "got rid of the whole bench."

J.W. continued to work but recalled taking off one day. He became concerned his gun would misfire when getting ready for work and curious about "what it would feel like" to hold his gun to his head. On January 17, 2021, J.W. responded to a call with C.G. regarding a "psychiatric patient who resided in town." J.W. relayed that "[i]n the past," officers would "wait for [the man] to come out" and he was "usually really good with talking to him." Upon arriving at the residence, J.W. refused based on safety concerns to go inside and decided "a SWAT team [needed] to handle the situation." J.W. expressed that after the first incident, he felt "[v]ery panicky," had a heightened safety response to "anybody with a mental issue," and was not effectively doing his job.

J.W. testified that another "critical incident" occurred on February 8, which caused the APD to offer "psychological help to go see a counselor." He and C.G. responded to a phone call from a colleague officer, M.M., requesting they go to his residence to assist his daughter. In testifying about M.M.'s call and suicide, J.W. explained he knew M.M. because they went to school together,

7

worked together, and their children were the same age. J.W. stopped working the next day.

After the second incident, on February 12, 2021, J.W. met Dr. Kelly for a "critical incident stress debriefing." He remained in treatment with Dr. Kelly for approximately a year and a half. She also referred him to a psychiatrist, and he was prescribed Abilify, Ativan, Cymbalta, Trazodone, and other medication. He testified to previously responding to over one hundred overdoses, ten suicides, and two fatal traffic accidents. J.W. explained that while he responded to numerous fatalities during his career, after the first incident, his sleep decreased, relationship with his wife changed, "brain [felt] like mush all the time," and focus diminished.

C.G. testified that she was the duty sergeant on the day of the first incident. After J.W.'s brother called regarding the murder-suicide, she and J.W. responded to the scene. C.G. knew the individuals involved were "somehow related" to J.W. Upon arriving at the residence, she and J.W. went to the backyard and observed a deceased male with an "apparent self-inflicted gunshot wound to his face/head area." C.G. testified that she immediately observed J.W. was "frantic" and "very upset." She explained that J.W. then "froze," was unable to search the house, and was sent home.

8

C.G. further testified that J.W. continued working and they both responded to a call involving an emotionally disturbed person a few days after the first incident. The individual had barricaded himself in an apartment, threatened suicide, and was known to have weapons. She recounted that J.W. did not want to breach the door, advised he was not entering the apartment, and requested the "SWAT team to" respond. She agreed that the SWAT team was "100%" necessary but conveyed that in the past, they would have entered the apartment themselves.

Dr. Kelly was qualified as an expert in police and public safety psychology and testified that she began treating J.W. after the APD referred him for "therapy services." Dr. Kelly's first treatment record was for a February 22, 2021 office visit. She noted that J.W. was "seeking treatment following two work-related critical incidents involving suicides of individuals close to him." She originally diagnosed J.W. with acute stress disorder and later, on March 12, diagnosed him with Post Traumatic Stress Disorder (PTSD). She confirmed treating J.W. for approximately a year and a half and testified that "the bulk of the treatment . . . and continuous therapy" involved the first incident. Dr. Kelly found J.W. was experiencing "chronic" PTSD symptomatology, including

9

anger, guilt, hypervigilance, overreacting, insomnia, and excessive startle responses.

Dr. Kelly opined that J.W.'s response to the murder-suicide of family members was "extremely traumatic," "a violent crime . . . that would be horrific and difficult to manage," and "very unique." She further opined the first incident "shook him to the core" and caused him to be mentally disabled, explaining it falls within the "category . . . call[ed] 'moral injury.'" During cross-examination, Dr. Kelly acknowledged that J.W. had worked consistently after the first incident, began treatment with her after the second incident, and had stopped working after "the second suicide." When Dr. Kelly was asked if the second incident "exacerbate[d] emotional reactions in [J.W.] . . . from the first incident," she stated, "Yes. That[ is] part of my opinion."

Dr. LoPreto was qualified as an expert in clinical psychology. He testified to meeting J.W. for approximately an hour and a half, which included psychological testing. They discussed the two critical incidents occurring within approximately four weeks of each other. Dr. LoPreto opined within a "reasonable degree of psychological" certainty that J.W. had PTSD and his mental disability was directly caused by the second incident. He noted that J.W. had responded to the first incident involving his family members after the

10

A-0249-24

murder-suicide had occurred and that J.W. continued working until the second incident.

Dr. LoPreto found it relevant that the second incident was more active. J.W. and C.G. responded to the colleague officer's phone call requesting their assistance for his sick daughter. After J.W. remained with the officer's family and the APD "pinned [the officer's] cell phone," the officer was discovered to have committed suicide. Dr. LoPreto testified that J.W. had explained being friends with the officer as they attended school together, lived in the same town, worked together, and participated in their children's sports together. J.W. had remained with the officer's family. After calling his brother, C.W. came to the residence because she was friendly with the officer's wife.

Dr. LoPreto testified that he was "not minimizing the first incident," but opined that the second incident was the cause of J.W.'s disability when viewed from "a functional capacity perspective." He found it relevant that J.W.: was working after the first incident; did not seek "mental health treatment after the first incident"; "got rid of his guns" only after the second incident; started treatment after the second incident and his Chief had sent him for a critical incident stress debriefing; and left the APD's employment after the second incident. Regarding "direct causality," Dr. LoPreto opined that "the cause of

11

[J.W.'s] disability, the cause of his inability to do his job, the cause of his work stoppage, the cause of his need for psychotherapy was after the second incident." He noted that J.W. was more "involved in" the second incident and thereafter had "broken down and could[ not] handle [working] anymore." Dr. LoPreto opined that "the objective documentation shows" J.W. had "significant functional impairment" after the second incident and not the first incident.

On July 8, 2024, the ALJ issued an initial decision affirming the Board's denial of J.W.'s ADR benefits. The ALJ noted the experts disagreed "on causation" regarding the traumatic event that resulted in J.W.'s disability. The ALJ observed that Dr. Kelly attributed J.W.'s disability to the first incident and that Dr. LoPreto determined his "disabling psychological condition is the culmination of several events," including the second incident and "not solely" the first incident. While the ALJ found both experts credible, he specifically found Dr. LoPreto's "testimony to be more persuasive and supported by the facts and the records in this case." Regarding Dr. Kelly's testimony, the ALJ found it significant that she "did not see [J.W.] until after the second incident." The ALJ found that Dr. LoPreto better addressed J.W.'s "continuant associative effect" of the incidents that caused his disability. Further, the ALJ considered Dr. LoPreto's medical conclusion was more "persuasive in" addressing that J.W.

"suffered a mentally disabling condition that was the accumulation of several traumatic events."

The ALJ determined that J.W. failed to meet his burden of demonstrating the first incident was "the type of qualifying event envisioned by Patterson."[2] The ALJ reasoned it was relevant regarding the first incident that J.W. did not "directly witness the murder or suicide," "describe being terrified" by an active dangerous scene, "describe a fear or terror of being in imminent danger for his life," nor express a "threat" existed to "another person." The ALJ found the first incident was not a qualifying "horrific event."

In considering all the ADR factors "de novo," the ALJ also "disagree[d] with the Board's position that the [first incident] . . . was 'undesigned and unexpected.'" The ALJ found the first incident was not an "external event with unanticipated consequences that were extraordinary or unusual."

On appeal, J.W. contends the ALJ erred in: misapplying Patterson and finding that the first incident did not meet the traumatic event threshold; finding that the first incident was not the direct cause of his disability; and improperly considering and finding that the first incident was undesigned and unexpected.

---

[2] Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 48 (2008).

13

II.

Our review of an agency determination is limited.  Russo v. Bd. of Trs.,

PFRS, 206 N.J. 14, 27 (2011).  "An agency's determination on the merits 'will

be sustained unless there is a clear showing that it is arbitrary, capricious, or

unreasonable, or that it lacks fair support in the record.'"  Saccone v. Bd. of Trs.,

PFRS, 219 N.J. 369, 380 (2014) (quoting Russo, 206 N.J. at 27).  "The 'search

for arbitrary or unreasonable agency action' may involve the question 'whether

the agency's action violates express or implied legislative policies, that is, did

the agency follow the law . . . .'"  Bowser v. Bd. of Trs., PFRS, 455 N.J. Super.

165, 170 (App. Div. 2018) (quoting Mazza v. Bd. of Trs., PFRS, 143 N.J. 22,

25 (1995)).  "We are not, however, 'bound by an agency's interpretation of a

statute or its determination of a strictly legal issue, particularly when that

interpretation is inaccurate or contrary to legislative objectives.'"  Mount v. Bd.

of Trs., PFRS, 233 N.J. 402, 418-19 (2018) (quoting Russo, 206 N.J. at 27)

(internal quotation marks omitted).  Thus, we review de novo "an agency's

interpretation of a statute or case law."  Russo, 206 N.J. at 27.

N.J.S.A. 43:16A-7 prescribes the permanent and total disability

requirements a member must meet to receive ADR benefits.  To qualify for ADR

benefits, an employee must demonstrate he or she "is permanently and totally

14

disabled as a direct result of a traumatic event occurring during and as a result of the performance of his [or her] regular or assigned duties." Mount, 233 N.J. at 419 (quoting N.J.S.A. 43:16A-7(a)(1)). ADR benefits "entitle[] a member to receive a higher level of benefits than those provided under an ordinary disability retirement." Patterson, 194 N.J. at 43.

"[A] traumatic event is . . . an unexpected external happening that directly causes injury and is not the result of pre-existing disease alone or in combination with work effort." Richardson v. Bd. of Trs., PFRS., 192 N.J. 189, 212 (2007). To establish entitlement to ADR benefits under N.J.S.A. 43:16A-7(a)(1), the Supreme Court has elucidated that a member must prove:

> 1. that he [or she] is permanently and totally disabled;
>
> 2. as a direct result of a traumatic event that is
>
>> a. identifiable as to time and place,
>>
>> b. undesigned and unexpected, and
>>
>> c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
>
> 3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;
>
> 4. that the disability was not the result of the member's willful negligence; and

15

5. that the member is mentally or physically incapacitated from performing his usual or any other duty.

[Mount, 233 N.J. at 421 (quoting Richardson, 192 N.J. at 212-13).]

Our Court has concluded that the words "traumatic event" and "direct result" in N.J.S.A. 43:16A-7 reflect the Legislature's intent "to make the granting of an accidental disability pension more difficult." Kasper v. Bd. of Trs. of the TPAF, 164 N.J. 564, 575-76 (2000). Whether a member's disability is the direct result of a traumatic event is within the ambit of expert medical opinion, which must establish "the requisite degree of medical causation between the claimant's disability and the [alleged] traumatic event[]." Korelnia v. Bd. of Trs., PERS, 83 N.J. 163, 171 (1980). In addressing whether an event is "undesigned or unexpected," the event should be considered as well as the member's "job description, training, and prior experience." Mount, 233 N.J. at 427. The Court has also defined regularly assigned duties as "all activities engaged in by the employee in connection with his or her work." Kasper, 164 N.J. at 585-86.

Further, the Legislature has clearly extended accidental disability "coverage for mental injuries" to members. Patterson, 194 N.J. at 44. To substantiate a covered traumatic mental injury, the member must demonstrate "that the disability resulted from a 'direct personal experience of a terrifying or

16

horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person.'" Mount, 233 N.J. at 424 (quoting Patterson, 194 N.J. at 34). "That event must be 'of consequence and objectively capable of causing a reasonable person to suffer a disabling mental injury.'" Id. at 426 (quoting Russo, 206 N.J. at 31). "If the event meets the Patterson test, the court then applies the Richardson factors to the member's application." Ibid. (quoting Russo, 206 N.J. at 32-33).

Our Court has provided "examples of retirement system members who 'could vault the traumatic event threshold,' . . . cit[ing] 'a permanently mentally disabled policeman who sees [their] partner shot; a teacher who is held hostage by a student; and a government lawyer used as a shield by a defendant.'" Id. at 423 (quoting Patterson, 194 N.J. at 50). "[A] member who seeks accidental disability benefits must prove a disabling permanent mental injury and, in so doing, must produce such expert evidence as is required to sustain that burden." Patterson, 194 N.J. at 50-51.

### III.

J.W. contends reversal of the Board's FAD is warranted because the first incident vaults the traumatic event threshold and directly resulted in his mental

17

disability.  After a review of the trial record and Board's FAD, which adopted the ALJ's findings regarding the Patterson test, we disagree.

We recognize that the Board's adoption of the ALJ's credibility findings is afforded deference.  Further, we note J.W. bears the burden of demonstrating that the first incident was a "qualifying traumatic event" that "in fact, caused him to be permanently and totally disabled."  Russo, 206 N.J. at 32 (emphasis omitted).

The ALJ found Dr. LoPreto's testimony—that the first incident was not the cause of J.W.'s disability, but rather that the second incident was the triggering event—to be more persuasive as it was substantially supported by the evidence.  In responding to the first incident, it is undisputed that J.W.:  did not directly witness the murder-suicide; did not respond to a crime in progress; never expressed personally being afraid for his safety or having a fear of "danger for his life"; and did not experience a threat of harm to any other person.  The ALJ further credited Dr. LoPreto's observation that J.W. had responded to the first incident involving family members only after the crime had occurred and thereafter only stopped working, went for counseling, and disposed of his guns after the second incident.  The Board's adoption of the ALJ's finding—that J.W. failed to establish the first incident was "the type of qualifying event envisioned

by Patterson"—is sufficiently supported by the record. Further, the record supports the conclusion that the first incident was not: (1) a "direct personal experience of a terrifying or horror-inducing event that involved actual or threatened death or serious injury, or a similarly serious threat to . . . another person"; and (2) "objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury."

Additionally, we are unpersuaded by J.W.'s argument that his response to his brother's in-laws' home after the murder-suicide satisfies the traumatic event threshold because it is substantially similar to the Supreme Court's traumatic event examples recited in Mount. We note the ALJ considered the Court's examples of members who were disabled from directly experiencing active threats, such as witnessing a partner's shooting, being a held hostage, and being used as a shield by a defendant. Mount, 233 N.J. at 424. In each example, the member directly experienced an active traumatic event that involved an actual threat of death or serious injury to the member or another person. In each example, the members were unable to remove themselves from experiencing the traumatic events. The ALJ noted that the "pivotal issue" was whether J.W. had experienced a direct personal experience of a terrifying or horror inducing event. While J.W. responded honorably and suffered mental repercussions from the

19

first incident, we discern no error in the Board's determination that the second incident was largely the cause of his disability rather than the first incident.

We next consider J.W.'s argument that it was improper for the ALJ to consider and conclude that the first incident was "undesigned and unexpected." Based on the present record, we agree. We note, however, the ALJ's finding does not change the fact that J.W. failed to meet the Patterson factors. We nevertheless address the merits of J.W.'s argument.

We agree the ALJ incorrectly considered whether the first incident was undesigned and unexpected. While an ALJ conducts a de novo review, the Board has not cited authority supporting that an ALJ is not generally bound by parties' lawful stipulations about the denial of ADR benefits. In the present case, the record indicates counsel agreed before the ALJ as to the limited issues presented. Cf. N.J.S.A. 52:14B-10(g) (allowing "parties in a contested case" to "stipulate to the factual record, and agree that there are no genuine issues of material fact to be adjudicated" and permitting agencies to "render [an FAD] . . . without obtaining the prior input" from an ALJ).

We also note N.J.S.A. 52:14B-9(b)(3) provides that a notice shall be provided in a contested case that includes "reference to the particular sections of the statutes and rules involved." The notice shall also include "[a] short and

20

plain statement of the matters asserted. If the agency or other party is unable to state the matters in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved." N.J.S.A. 52:14B-9(b)(4). While N.J.A.C. 1:1-14.6(h) authorizes an ALJ to "render any ruling or order necessary to decide any matter presented to him or her which is within the jurisdiction of the transmitting agency," it does not preclude the parties from limiting the issues presented. Thus, at the inception of the trial, the better course to follow, is for the ALJ to confirm the parties' stipulations and to clarify the issues presented on the record. If an ALJ is going to decide issues outside of the parties' stipulations and fairly presented evidence, the parties should be provided notice and an opportunity to present further evidence and arguments.

In sum, having considered J.W.'s arguments in light of the record and applicable law, we affirm the Board's FAD denying his ADR benefits claim. Substantial credible evidence in the record supports the Board's adoption of the ALJ's determination that J.W.'s disability did not meet the Patterson factors and arise "as a direct result of a traumatic event." Mount, 233 N.J. at 419 (quoting N.J.S.A. 43:16A-7(a)(1)). The Board's decision was not arbitrary, capricious, or unreasonable and did not constitute a mistake of law. Therefore, we discern

A-0249-24

no reason to disturb the Board's FAD affirming the denial of J.W.'s ADR benefits.

Affirm.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0249-24